TIEDE, Appellant, vs. SCHNEIDT, imp., Respondent.

*January 11 — February 2, 1900.*

*Municipal corporations: Contracts: Disposal of garbage: Nuisances:
Waters: Evidence: Circuit judge: View of premises: Injunction.*

1. Under ch. 288, Laws of 1897 (authorizing cities of the first class "to
   provide by contract or otherwise for the disposal of their garbage,"
   etc.), it is competent for a city of that class to contract with the
   operator of a rendering plant, maintained outside of the city limits,
   to receive at such plant dead animals, and to there render, convert,
   consume, or otherwise dispose of the same in a sanitary and in-
   offensive manner.

2. Where one of such cities never maintained or operated such an es-
   tablishment, and had no connection therewith except to deliver to
   the proprietors dead animals found within its limits, there is noth-
   ing in the act which made such delivery unlawful or a nuisance.

3. A court of equity is justified in refusing to restrain the depositing
   of dead animals, etc., in a running stream, even if such acts were
   illegal under sec. 1418, Stats. 1898, unless it is made to appear
   that such acts were injurious to the property or property rights of
   the plaintiff.

4. It is permissible for the circuit judge, in an equity case, to visit and
   view the premises in question, where the only purpose of such view
   was to enable the court to weigh and appreciate the evidence in
   the case better than it otherwise could.

5. An action to have defendant's establishment, wherein dead animals
   and offal therefrom were converted and manufactured into mar-
   ketable products, adjudged a private nuisance, to abate the same,
   and to recover damages on account thereof, and for an injunction,
   is addressed to the conscience of the court, and it is necessary for
   the court to be convinced that the plaintiff is sustaining substan-
   tial injury before restraining the operation of the plant.

APPEAL from a judgment of the superior court of Milwau-
kee county: J. C. LUDWIG, Judge. *Affirmed.*

For the appellant there was a brief by *N. S. Murphey*, at-
torney, and *Wheeler & Perry*, of counsel, and oral argument
by *Mr. Murphey.* The contended, *inter alia*, that municipal
corporations cannot exercise their powers beyond their own

Tiede vs. Schneidt.

territorial limits, unless by the express provisions of the statute conferring such authority. Tiedeman, Mun. Corp. §§ 62, 201; *Begein v. Anderson,* 28 Ind. 79; *Coldwater v. Tucker,* 36 Mich. 474; *Pack, Woods & Co. v. Greenbush,* 62 Mich. 122; Dillon, Mun. Corp. (4th ed.), §§ 184, 358, 446, 908, and notes; *Strauss v. Pontiac,* 40 Ill. 301; *La Fayette v. Cox,* 5 Ind. 38; *Smith v. Madison,* 7 Ind. 86; *Kyle v. Malin,* 8 Ind. 34; *Chicago P. & P. Co. v. Chicago,* 88 Ill. 221; *State v. Franklin,* 40 Kan. 410; *Gould v. Rochester,* 105 N. Y. 46; *Rily v. Rochester,* 9 N. Y. 64; 15 Am. & Eng. Ency. of Law, 1006; *Watertown v. Robinson,* 69 Wis. 237; 23 Am. & Eng. Ency. of Law, 446; *Pittsburg's Appeal,* 79 Pa. St. 317; *Circleville v. Neuding,* 41 Ohio St. 465.

For the respondent there was a brief by *V. W. Seely,* attorney, and *Quarles, Spence & Quarles,* of counsel, and oral argument by *Charles Quarles.*

Cassoday, C. J. This action was commenced September 24, 1897, to have a certain structure and establishment maintained by the defendants, where dead animals and the carcasses and offal therefrom are converted and manufactured into marketable products, located upon the land described, upon the banks of the Menominee river, adjudged to be a private nuisance to the plaintiff, and to abate the same, and to recover damages on account thereof, and for an injunction. The plaintiff alleges, in effect, the facts stated, and also that the defendants have maintained such plant ever since August 26, 1897; that during that time the defendants have daily caused the blood and offal from such animals to be deposited in the waters of the Menominee river, a running stream flowing through the town of Wauwatosa, and through the cities of Wauwatosa and Milwaukee, and the waters of which by such deposits were and are polluted, and rendered unwholesome and unfit for use for watering stock or any domestic purpose; that, by reason of

such deposits and the operation of such plant, the air became impregnated with unwholesome vapors and smells emitted therefrom, to the irreparable injury and nuisance of the plaintiff. The defendant *Schneidt* answered by way of admissions, denials, and counter allegations, to the effect that the structure and plant mentioned had been conducted and operated for more than twenty-one years in substantially the same way, and with the same results, as on August 26, 1897, and since, and expressly denied that any blood or offal of dead animals, or part thereof, or putrid substance, had been deposited in the river, or that the establishment had become or was or is a nuisance to the plaintiff or to any one.

At the close of the trial the court found, as matters of fact, in effect, that the plaintiff is, and for more than three years last past has been, the owner in fee and in possession of the lot described, together with the dwelling house thereon, in which he resides and has resided during such period; that at the time of the commencement of this action the defendant *Schneidt* was maintaining and for many years next preceding that time had continuously maintained and operated, upon the premises described in the complaint, an establishment for the manufacture of hair, and for a number of years next prior to the commencement of this action had used such establishment for the purpose of rendering dead animals, and converting their substance into a merchantable product; that during such time he has, on an average, rendered daily one or more dead horses and other dead animals; that the premises described contained eight acres of land; that the defendant city of Milwaukee never maintained or operated the establishment, but that ever since August 26, 1897, until the commencement of this action, that city delivered to the defendant *Schneidt*, at his establishment, such dead animals as were found in the streets of that city, for the purpose of having the carcasses thereof rendered by the defendant *Schneidt* at his establishment;

that at all times since August 26, 1897, the carcasses of dead
animals which have been treated in such establishment have
been rendered in air-tight and steam-tight tanks, so that.
none of the gases or effluvia from the process of rendering
could escape into the open air, except on one occasion, oc-
curring in May, 1898, when, by accident, the steam pack-
ing around the manhole in one of the tanks was blown out
by the force of the steam, and such gases and effluvia es-
caped for a few hours, until the damaged apparatus could
be repaired, and on one or two occasions prior to August 26,
1897, and before the apparatus of the defendant *Schneidt*
had been perfected; that the defendants have not, nor has.
either of them, in any way polluted the waters of the Menom-
inee river; that the waste steam from the rendering tanks
of the defendant *Schneidt* is, and has been at all times, con-
densed and conducted into a covered catch-basin, and thence
into the drain thereinafter mentioned; that large quantities.
of water used in the defendant's establishment flow into the
drain, which is described in the testimony; that the drain
runs into and through another catch-basin, having a strainer
on the outlet thereof, and thence a distance of several hun-
dred feet into the Menominee river; that the defendants.
have not, nor has the establishment, except on the single
occasion mentioned, polluted or contaminated the air so as.
to materially or substantially impair the comfortable en-
joyment by the plaintiff and his family of his and their resi-
dence, nor has the establishment or the defendant in any
way materially interfered with or impaired the comfortable
enjoyment of the plaintiff's premises; that the only connec-
tion the city of Milwaukee has had with the establishment.
arises from the fact that the health department of that city
entered into an agreement with the defendant *Schneidt* that,
if he would render and dispose of the carcasses of dead ani-
mals found in that city in an inoffensive and sanitary man-
ner, it (the health department of that city) would cause the

carcasses to be delivered at the establishment of the defendant *Schneidt;* that the locality in which the establishment of the defendant *Schneidt* is located is, on account of its situation and surroundings, particularly adapted for such manufacturing establishment, and is not adapted to residence purposes, except to the residences of such persons as may be connected with the industrial establishments which are or may be located in that neighborhood; that at all times since August 26, 1897, all carcasses of animals treated at the establishment of the defendant *Schneidt* have been converted into merchantable products, viz. grease and fertilizers, which products are, and at all times have been, innocuous and inoffensive to the neighborhood; that the establishment of the defendant *Schneidt* is not, and has not been since August 26, 1897, a nuisance to the premises of the plaintiff.

And as conclusions of law the court finds, in effect, that the plaintiff is not, and has not been, injured by any of the doings of the defendants, or either of them; that the plaintiff is not, and was not at the commencement of this action, entitled to any injunction herein; that the complaint herein should be dismissed on the merits; that the defendant *Schneidt* is entitled to recover of the plaintiff his costs and disbursements in this action. It was therefore ordered that judgment be entered dismissing the complaint on the merits, and for the recovery by the defendant *Schneidt* of his costs and disbursements to be taxed.

From the judgment thereupon in favor of the defendants and against the plaintiff, dismissing the complaint upon the merits, with costs and disbursements to be taxed in favor of the defendant *Schneidt*, the plaintiff brings this appeal.

It is contended that the city of Milwaukee had no authority to dispose of dead animals found therein outside of the city limits in the manner indicated. The argument is that the statute only gave authority " to provide by contract or

otherwise for the disposal of their garbage, and to purchase or lease lands within the limits" of the city, "and to erect crematories or other works for the reduction or disposal" of such "garbage, and to operate the same," and "to maintain and operate such garbage consuming plant or reduction works and to render dead carcasses, and to convert such products as may be deemed fit, and sell and dispose of the same at private sales or by contract," and that such "converting and rendering establishment should be run and conducted according to the most approved sanitary methods." Ch. 288, Laws of 1897. That act gave authority to do within the city limits what is claimed to have been a nuisance when done outside of the city limits. The act further authorized the common council, in its discretion, "to acquire by purchase, or by assignment from any person, company or corporation, any plant" then "in existence in this state for the purpose of reducing said garbage, and to operate the same, with all the powers" therein "given to such city." Sec. 4, id. That statute was not enacted to reduce the powers of cities of the first class, but to enlarge them. The plant in question had existed and been operated for many years prior to the time complained of, for the purpose indicated. It was competent, under the statute cited, therefore, for the city to acquire that plant by purchase or by assignment, and to operate the same. In the law of contracts, the word assignment seems to be broad enough to include the transfer of an interest in lands and tenements. Bouvier, Law Dict. Thus it appears that the city was expressly authorized to contract with *Schneidt,* as the operator of that plant, to receive at such plant dead animals, and to "there render, convert, consume, or otherwise dispose of the same in a sanitary and inoffensive manner," as it did by the contract of August 21, 1897. But it appears from that agreement, and is, in effect, found by the court, and such finding is supported by the undisputed evidence, that the city of Milwaukee never maintained

or operated that establishment, and had no connection there-with, except to deliver to *Schneidt* dead animals as men-tioned; and there is nothing in the act which made such delivery unlawful or a nuisance.

It is contended that the statute which prohibits any per-son from erecting, maintaining, or keeping any slaughter-house upon the banks of any river, running stream, or creek, or throwing or depositing therein any dead animal, or any part thereof, or any carcass or offal therefrom, etc., makes. the operation of the plant in question a nuisance. Sec. 1418, Stats. 1898. But the facts found by the court, as above stated, do not bring the case within the provisions of that section, and there seems to be plenty of evidence to support such find-ings. But, even if the facts were sufficient to bring the case within the purview of the section, yet, as held upon the for-mer appeal, a court of equity was justified in refusing to re-strain such illegal acts merely because they were illegal, unless it was made to appear that such acts were injurious to the property or property rights of the plaintiff. 99 Wis. 201.

This brings us to the important question whether the plant, as operated by the defendant *Schneidt* during the time in question, was a nuisance to the plaintiff and his family, residing in a house about 387 feet from *Schneidt's* land, and about 439 feet from his building. The main building is de-scribed by counsel for the plaintiff as being, in effect, 100 feet. long and fifty feet wide, six stories high, with an addition thereto forty feet square. There are ninety swinging win-dows on each of the north and south sides of the main build-ing, making 180 windows in the north and south sides of the building, having no glass in the upper floors. There are 304 windows in the building, besides two doors. In addition to this, there are two doors fronting south on the main building,— one about eight feet wide, where they drive through from the north and south with dead animals,

and unload them in the west end of the main building on the floor, the floor being about twenty or twenty-four feet, including the width of the main building. The steam tank where they cook the animals is about twenty feet east of where they drive through with the dead animals. The tank is set partly in the second floor and partly in the first, extending from the first up to and above the second floor about six feet.

The defendant *Schneidt*, whose deposition, taken under sec. 4096, Stats. 1898, was put in evidence by the plaintiff, testified, among other things, in regard to the operating of the plant, to the effect that what he means by process of rendering or converting is not in the old style; it is a new system entirely; it is reducing, destroying, doing away with,— that is what he means; that there is no rendering in open kettles or retorts; that what they do with the animals is to clean them,— that is the first part of the industry; that the next thing they are chopped into pieces large enough to go in a large, steel, steam-tight tank, called "a digester;" that when the animals are in the tank the manhole is closed, and the steam turned on; that there is nothing that can escape,— no steam, or gas, or anything; that that is all they do with the animals; that while the animals are being skinned they are taken inside the building, which is large enough for the few horses they have during a particular time; that the building is 100x50 feet; that he could put in the kettle the full capacity, which would be eleven or twelve, according to the size of the animals themselves,— if small, twelve, if large, probably only nine; that from the time they receive the animal on the floor and put it in the tank it takes about thirty-five minutes for each animal; that the receptacle or vessel where they put these animals is called the tank or "digester;" that this tank remains open during the process of skinning and cutting; that under the contract he had no consideration stipulated to be paid

to him for such services; that the city in fact pays him nothing; that this product of the rendering and conversion he sells, and it is called hides, hair, oil, and bones,— bones for fertilizers, and for making boneblack for filtering sugar, and they use it for different industries; that since August 25, 1897, he had received from the city sixty-two animals,— a little over two a day up to the time of the injunction,— fifty-nine horses and three cows.

There is plenty of evidence that the premises were in as clean and sanitary condition as such an institution could well be kept; that no dead animals were permitted to lie around, but were all in the tank when in operation; that there was an odor peculiar to all rendering establishments; that upon going through the building from the ground floor to the top, nothing could be detected that could be considered particularly offensive; that the drain or sewer leading from the building down to the catch-basin was covered, and the catch-basin itself was covered; that the catch-basin contained a large amount of dark-colored fluid; that from the upper to the lower catch-basin the overflow of such fluid was carried in a covered drain; and from the lower catch-basin the overflow was carried in a covered drain to the river; that the odor along the drains was not particularly offensive, and several say not offensive at all; that the small stream of water running from the drain into the river was perfectly clear; that at that point in the river there was no scum on the water or stones; that small fish were swimming around in the river at the point where the drain emptied into it.

Assuming it to be true, there is certainly plenty of evidence to support the findings of the trial court. On the contrary, there is plenty of evidence to the effect that within a radius of 1,500 feet from the plant in question there are two school buildings and numerous families, and that at certain times the smells from the plant are very bad and

sickening.   It may be that some of the occasions referred to.
were when the " digester " or apparatus was out of repair, as-
mentioned.   Were we sitting as a trial court, some of us
might be inclined to hold that the preponderance of the evi-
dence is in favor of the plaintiff.   But the trial court had
far better opportunity for weighing the evidence and ascer-
taining the truth than we have.   The learned trial judge
manifestly tried to ascertain the truth, and find accordingly.
It is recited in the findings that, after the cause was tried,
and while holding it under advisement, he visited and viewed
the premises on three separate occasions, and while the es-
tablishment was in operation, and made the findings after·
having fully considered the matter.   Such views enabled
the court to weigh and appreciate the evidence in the case
much better than otherwise.   We assume that was.the only;
purpose of such views, and so they were permissible.   The
actual conditions of the plant when in operation and when
idle were, manifestly, more convincing than the statement
of witnesses as to what they did or did not smell at certain
times and distances from the plant.   This was not a jury
trial, and, of course, the court was not called upon to instruct.
the jury as to the correct rule of law in weighing positive
and negative testimony, as in the case cited, and seemingly
relied upon by both parties.   *Pennoyer v. Allen*, 56 Wis. 502.
The case at bar was addressed to the conscience of the court,.
and it was necessary for the court to be convinced that the
plaintiff was sustaining substantial injury before restraining·
the operation of the plant in question.   As stated in the case
last cited: " Of course, the law is not so rigid as to make
every business which imparts any degree of impurity to the·
atmosphere a nuisance.   The law is practical as·well as·just.
The maintenance of life and business, especially in· crowded
cities, necessitates the imparting of a certain degree of im-
purity to the atmosphere.   The law gives protection only
against substantial injury.   To be of legal cognizance, the·

Bading vs. The Milwaukee Electric R. & L. Co.

injury must be tangible, or the discomfort perceptible to the senses of ordinary people." *Pennoyer v. Allen*, 56 Wis. 510, 511. This court is unable to say, from the record before us, that the findings of the trial court are contrary to the clear preponderance of the evidence.

*By the Court.*— The judgment of the superior court of Milwaukee county is affirmed.