JOHN McDONOUGH v. RUSSELL-MILLER MILLING COMPANY, a Corporation.

(165 N. W. 504.)

**Land — traversed by natural stream — owner of land — must not prevent natural flow — nor pollute water — reasonable use by.**

1. The owner of land traversed by a natural stream may not prevent the natural flow of or pollute the stream, but he may rightfully use the water therein for any reasonable purpose as long as it remains on his land.

**Riparian owner — natural stream — may make reasonable use of.**

2. The right of a riparian owner to have a natural stream continue to flow through or by his premises in its natural quantity and quality is subject to the right of each riparian owner to make a reasonable use of the waters in the stream as long as it remains on his land.

**Use of by owner — domestic purposes — manufacturing — agricultural — circumstances.**

3. The right to make reasonable use of a stream extends not only to the use thereof for domestic purposes, but where the circumstances of the case make the use a reasonable one, it extends also to the use thereof for manufacturing, agricultural, and similar purposes.

**Use of stream — reasonableness of — test of.**

4. The test of the rightfulness of the use which an owner is attempting to make of a stream is whether such use is reasonable.

---

NOTE.—The correlative rights of upper and lower proprietors as to use and flow of water in a stream are discussed in a note in 41 L.R.A. 737, which, after giving a general statement of the right and its application to different states of facts as arising in specific cases, discusses the right to use, flow, use for sewer purposes, and the right to relief, and the forms thereof, for violation.

38 N. D.—30.

**Riparian owner — reasonable use of water — question of fact — circumstances.**

5. What is a reasonable use by a riparian owner of the waters in a natural stream is primarily a question of fact to be determined in view of all the circumstances of the case.

**Damages for pollution — action by riparian owner — unreasonable use — detriment the result of.**

6. To enable a riparian owner to maintain an action for damages for the pollution of a stream, he must show not only that defendant has made an unreasonable use of the stream, but that the detriment of which he complains was the result of such unreasonable use.

**Riparian owner — injunctive relief — against use of stream — right to — unreasonable use — must show.**

7. To entitle a riparian owner to injunctive relief, he must show not only that the defendant makes or threatens to make unreasonable use of the waters in the stream, but must further establish facts which entitle him to such relief under the general equitable principles applicable to injunctions.

**Unreasonable use — damages — action for — injunctive relief — evidence — failure of proof.**

8. Evidence examined, and, under the above-stated principles of law, it is *held* that plaintiff has failed to establish a cause of action either for damages or for injunctive relief against the defendant, and that judgment was properly rendered for defendant.

Opinion filed October 2, 1917.　Rehearing denied December 14, 1917.

From a judgment of the District Court of Stark County, *Crawford,* J., plaintiff appeals.

Affirmed.

*F. C. Heffron* and *Murtha & Sturgeon,* for appellant.

Where one uses a natural running stream of water as a dumping place for all offal matter from his mill, and for all the excrement of his many employees, this is not a reasonable use, by a riparian owner, so as to exempt him from damages, and furthermore, such acts are criminal under our statutes. Comp. Laws 1913, §§ 10,225 and 10,226; Satterfield v. Rowan, 83 Ga. 187, 9 S. E. 677; Red River Roller Mills v. Wright, 30 Minn. 249, 44 Am. Rep. 194, 15 N. W. 167; Weston Paper Co. v. Pope, 155 Ind. 394, 56 L.R.A. 899, 57 N. E. 719; 2 Farnham, Waters, pp. 1705 and 1709.

The pollution of a stream being a wrongful act, no permanent right

to continue it can be acquired. The foundation for damages is the diminished rental value of the property because of the pollution of the stream. A recovery may also be had for any special injury caused by the wrongful act of unreasonable use. 2 Farnham, Waters, p. 1718, § 527; 40 Cyc. 601 (g); Handforth v. Maynard, 154 Mass. 414, 28 N. E. 348; Ferguson v. Firmenich Mfg. Co. 77 Iowa, 576, 14 Am. St. Rep. 319, 42 N. W. 448; Hollenbeck v. Marion, 116 Iowa, 69, 89 N. W. 210; Weston Paper Co. v. Pope, 155 Ind. 394, 56 L.R.A. 899, 57 N. E. 719; Weston Paper Co. v. Comstock, — Ind. —, 58 N. E. 79; North Point Consol. Irrig. Co. v. Utah & S. L. Canal Co. 23 Utah, 199, 63 Pac. 812; Farr v. Griffith, 9 Utah, 416, 35 Pac. 506; Muncie Pulp Co. v. Martin, 164 Ind. 30, 72 N. E. 882; Muncie Pulp Co. v. Keesling, 166 Ind. 479, 76 N. E. 1002, 9 Ann. Cas. 530; Straight v. Hover, 79 Ohio St. 263, 22 L.R.A.(N.S.) 276, 87 N. E. 174.

"If one up the stream, in his works, be they ever so lawful, honorable or necessary for public or private weal, do thereby injure the land of that owner further down the stream, by unlawful invasion of it, by casting upon it things damaging it, or by polluting the purity of the water, rendering it unfit for the owner's consumption as it passes through his land, the man up the stream must answer in damages." Day v. Louisville Coal & Coke Co. 60 W. Va. 27, 10 L.R.A.(N.S.) 167, 53 S. E. 776.

The plaintiff is entitled to his injunctional remedy. The showing is that defendant, by its unreasonable and unlawful use of the stream, has so polluted its waters as to render them unfit and unsafe for those farther down the stream to use. Barrett v. Mt. Greenwood Cemetery Asso. 159 Ill. 385, 31 L.R.A. 109, 50 Am. St. Rep. 168, 42 N. E. 891; Weston Paper Co. v. Pope, 155 Ind. 394, 56 L.R.A. 899, 57 N. E. 719; Kewanee v. Otley, 204 Ill. 402, 68 N. E. 388; Pittsburgh, C. C. & St. L. R. Co. v. Crothersville, 159 Ind. 330, 64 N. E. 914; Strobel v. Kerr Salt Co. 164 N. Y. 303, 51 L.R.A. 687, 79 Am. St. Rep. 643, 58 N. E. 142, 21 Mor. Min. Rep. 38; Ferguson v. Firmenich Mfg. Co. 77 Iowa, 576, 14 Am. St. Rep. 319, 42 N. W. 448; Bradley v. Warner, 21 R. I. 36, 41 Atl. 564; Farnham, Waters, pp. 1689, 7108, §§ 522 et seq.; Chapman v. Rochester, 110 N. Y. 273, 1 L.R.A. 297, 6 Am. St. Rep. 366, 18 N. E. 88; Barton v. Union Cattle Co. 28

Neb. 350, 7 L.R.A. 457, 26 Am. St. Rep. 340, 44 N. W. 454; Columbus & H. Coal & I. Co. v. Tucker, 48 Ohio St. 41, 12 L.R.A. 577, 29 Am. St. Rep. 528, 26 N. E. 630; Hodges v. Pine Products Co. 135 Ga. 134, 33 L.R.A.(N.S.) 74, 68 S. E. 1107, 21 Ann. Cas. 1052; Trevett v. Prison Asso. 98 Va. 332, 50 L.R.A. 564, 81 Am. St. Rep. 727, 36 S. E. 373.

Statutes like our own are to be liberally construed with a view to enforcing the object for which they were intended. 2 Farnham, Waters, pp. 1533 and 1534; People v. Truckee Lumber Co. 116 Cal. 397, 39 L.R.A. 581, 58 Am. St. Rep. 183, 48 Pac. 374; State v. Taylor, 29 Ind. 517; Com. v. Yost, 11 Pa. Super. Ct. 323; Catlin v. Valentine, 9 Paige, 575, 38 Am. Dec. 567.

*Watson, Young, & Conmy,* for respondent.

"A trial *de novo* cannot be had in the supreme court in an action properly triable to a jury, even though a jury was waived and the cause tried to the court." Novak v. Lovin, 33 N. D. 424, 157 N. W. 297.

Appellant's so-called "citation of errors" is insufficient, and is not in compliance with the statute, even in a case where a trial *de novo* might properly be asked. Comp. Laws 1913, § 7656.

The evidence in this case cannot be reviewed in its entirety to determine whether or not the findings are sustained, since the case was not proprly tried under the statute authorizing such procedure. More v. Burger, 15 N. D. 345, 107 N. W. 200; Dowagiac Mfg. Co. v. Hellekson, 13 N. D. 257, 100 N. W. 717; Gagnier v. Fargo, 12 N. D. 219, 96 N. W. 841; Flora v. Mathwig, 19 N. D. 4, 121 N. W. 63; Updegraff v. Tucker, 24 N. D. 171, 139 N. W. 366.

The findings of the trial court are at least presumed to be correct. State Bank v. Maier, 34 N. D. 259, 158 N. W. 346.

It is well settled in this state, where it appears that the loss or injury might have been caused in several different ways and because of several different reasons, then the burden is on the plaintiff to show that the injury or loss was occasioned because of the fault of the defendant. Meehan v. Great Northern, 13 N. D. 443, 101 N. W. 183; Balding v. Andrews, 12 N. D. 267, 96 N. W. 305, 14 Am. Neg. Rep. 615; Garraghty v. Hartstein, 26 N. D. 148, 143 N. W. 390; Koslowski v. Thayer, 66 Minn. 150, 68 N. W. 973; Dobbins v. Brown, 119 N. Y. 188, 23 N. E. 537.

The appropriate functions of the legislature are to make laws to operate on future incidents, and not to make decisions or forestall rights accrued or vested under previous laws. Duncombe v. Prindle, 12 Iowa, 12; Elmondorff v. Carmichael, 3 Litt. (Ky.) 472, 14 Am. Dec. 86.

A plaintiff alleging negligence must prove it. This proof must not be by mere speculation or possibility.

"The plaintiff must show that the act or omission of which he complains was the act or omission of the defendant, and also that such act or omission was a negligent one." Sheldon v. Hudson River R. Co. 29 Barb. 228; Longabaugh v. Virginia City & Truckee R. Co. 9 Nev. 296; Smith v. Hannibal & St. J. R. Co. 37 Mo. 295; Omaha & R. Valley R. Co. v. Clark, 35 Neb. 867, 23 L.R.A. 504, 53 N. W. 970; White v. Chicago, M. & St. P. R. Co. 1 S. D. 330, 9 L.R.A. 824, 47 N. W. 146; Balding v. Andrews, 12 N. D. 277, 96 N. W. 305, 14 Am. Neg. Rep. 615; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000; Garraghty v. Hartstein, 26 N. D. 148, 143 N. W. 390.

"Where different parties pollute a stream by discharge of sewerage therein, each from his own premises, and each acting separately and independently of the others, one of the number is not liable for all the injury suffered by another, because of the nuisance thus created; each is liable to the extent only of the wrong committed by him." Chipman v. Palmer, 77 N. Y. 51, 33 Am. Rep. 566.

The fact that it is difficult to separate the injury done by each one from that of others should furnish no reason for holding that one tort-feasor should be liable for the acts of others with whom he is not acting in concert. Barrett v. Third Ave. R. Co. 45 N. Y. 628; Webster v. Hudson River R. Co. 38 N. Y. 260; Sheridan v. Brooklyn City & N. R. Co. 36 N. Y. 39, 93 Am. Dec. 490, 9 Am. Neg. Cas. 619; Chapman v. New Haven R. Co. 19 N. Y. 341, 75 Am. Dec. 344; Colegrove v. New York & N. H. R. Co. 20 N. Y. 492, 75 Am. Dec. 418; Creed v. Hartmann, 29 N. Y. 591, 86 Am. Dec. 341; Chipman v. Palmer, 77 N. Y. 51, 33 Am. Rep. 566; Harley v. Merrill Brick Co. 83 Iowa, 73, 48 N. W. 1000; Sellick v. Hall, 47 Conn. 260; Loughran v. Des Moines, 72 Iowa, 382, 34 N. W. 172; Martinowsky v. Hannibal, 35 Mo. App. 70; Little Schuylkill Nav. R. & Coal Co. v. Richards, 57 Pa. 142, 98 Am. Dec. 209, 10 Mor. Min. Rep. 209; Miller v. Highland

Ditch Co. 87 Cal. 430, 22 Am. St. Rep. 254, 25 Pac. 550; Brown v. McAllister, 39 Cal. 573; Westgate v. Carr, 43 Ill. 450; Partenheimer v. Van Order, 20 Barb. 479; Lull v. Fox & W. Improv. Co. 19 Wis. 100; Brennan v. Corsicana Cotton Oil Co. — Tex. Civ. App. —, 44 S. W. 588; Vansteenburgh v. Tobias, 17 Wend. 562, 31 Am. Dec. 310; Auchmuty v. Ham, 1 Denio, 495; Keyes v. Little York Gold Washing & Water Co. 53 Cal. 724, 14 Mor. Min. Rep. 95; Sloggy v. Dilworth, 38 Minn. 179, 8 Am. St. Rep. 656, 36 N. W. 451; Harley v. Merrill Brick Co. 83 Iowa, 73, 48 N. W. 1000; Sellick v. Hall, 47 Conn. 260; Watson v. Colusa-Parrot Min. & Smelting Co. 31 Mont. 513, 79 Pac. 15; Mansfield v. Bristor, 76 Ohio St. 270, 10 L.R.A.(N.S.) 806, 118 Am. St. Rep. 852, 81 N. E. 631, 10 Ann. Cas. 767; Standard Phosphate Co. v. Lunn, 66 Fla. 220, 63 So. 430; Newark v. Chestnut Hill Land Co. 77 N. J. Eq. 23, 75 Atl. 645.

Proof of special damages is not permissible unless the specific facts are clearly pleaded. Potter v. Froment, 47 Cal. 166; Glass v. Gelvin, 80 Mo. 297; Benson v. Chicago & A. R. Co. 78 Mo. 504; Capital Bank v. Armstrong, 62 Mo. 59; Moffatt v. Conklin, 35 Mo. 453; Iron Mountain Bank v. Murdock, 62 Mo. 70; Brown v. Chicago & A. R. Co. 80 Mo. 459; Solms v. Lias, 16 Abb. Pr. 311; Donnell v. Jones, 13 Ala. 490, 48 Am. Dec. 49; Cushing v. Seymour, S. & Co. 30 Minn. 301, 15 N. W. 249; Wood's Mayne, Damages, 1st ed. 707–714; 1 Sutherland, Damages, pp. 673–766; 2 Sutherland, Damages, pp. 383–392; Thompson v. Webber, 4 Dak. 245, 29 N. W. 671; Bissell v. Olson, 26 N. D. 60, 143 N. W. 340.

"In an action for the loss of ice destroyed by defendants by draining the waters of a pond, the measure of damages is the value of the plaintiff's right to harvest the ice upon the pond and so to make it his property at the time it was destroyed." Handforth v. Maynard, 154 Mass. 414, 28 N. E. 348.

"In an action for tort, damages for loss of profits in business may be recovered if they can be definitely ascertained and are the direct result of the injury." Paul E. Wolff Shirt Co. v. Frankenthal, 96 Mo. App. 307, 70 S. W. 378; Coyle v. Pittsburg, B. & L. E. R. Co. 18 Pa. Super. Ct. 235; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000; Spicer v. Northern P. R. Co. 21 N. D. 61, 128 N. W. 302.

CHRISTIANSON, J. This action was commenced by the plaintiff in June, 1914, to recover damages for the alleged pollution of the waters in the Heart river, and to enjoin further pollution thereof. The case was tried to the court without a jury, and resulted in findings and conclusions favorable to the defendant, with an allowance of nominal damages to plaintiff assessed at $100. The plaintiff appeals from the judgment, and demands a trial *de novo* in this court.

Both parties are riparian owners upon the Heart river within the limits of the city of Dickinson. The plaintiff owns a tract of land traversed by the Heart river. He has utilized this tract in part for raising vegetables, but principally as a pasture for horses and cattle. He also maintains an ice house, which is situated on the bank of the river on this land. Immediately below plaintiff's land is a concrete dam constructed by the Northern Pacific Railroad Company some five or six years prior to the commencement of this action. This dam is situated about 2,060 feet below plaintiff's ice house, and he cut ice from the pond formed above the dam.

Up stream from the plaintiff's premises is located a tract of land owned by the defendant. Some four years prior to the commencement of this action the defendant constructed a large flouring mill upon its land. It used the water of the Heart river in the mill to wash the wheat, taking the water for such purpose from a small dam that extended across the stream above the mill. The drainage from the mill led into the river at a point 6,350 feet above plaintiff's ice house. The plaintiff claims that this drainage, consisting of the water so utilized in washing wheat and the discharge of a certain water-closet used by the employees of the mill, polluted the waters of the Heart river, and caused them to become "absolutely unfit for any use in connection with any human or animal food or drink, and rendered all ice cut on said pond unfit and dangerous for use to which ice is commonly used, and valueless and unsalable, thereby destroying utterly the value and profitableness of said ice business."

Before discussing the questions of fact presented in this case, we deem it desirable to consider the rules of law which must be applied in determining those questions and in fixing the rights and liabilities of the parties to this litigation.

The owner of land traversed by a natural stream may use the water

therein so long as it remains on his land, but he may not prevent the natural flow of the stream nor pollute it. Comp. Laws 1913, § 5341. The right to the use of the water in its natural flow is not a mere easement or appurtenance, but is a natural right inseparably annexed to the soil itself, which arises immediately with every new division or severance of ownership. (Gould, Waters, § 204.) The right of a riparian owner to have a natural stream continue to flow through or by his premises in its natural quantity and purity is necessarily subject to the right of each riparian proprietor to make a reasonable use thereof. (40 Cyc. 592, 594; 30 Am. & Eng. Enc. Law, 358; Gould, Waters, § 208.) In every case the test "of the rightfulness of the use which one owner is attempting to make of the stream is whether or not such use is reasonable under all the circumstances of the case." 30 Am. & Eng. Enc. Law, 358; Farnham, Waters, § 516.

It cannot be contended that every use of a stream which either decreases the amount or purity of its waters is unreasonable. If this was true, the right of riparian owners to use the waters of the stream would largely be a right without value or benefit. For clearly many, if not most, of the uses to which streams are ordinarily put tend to decrease in some degree at least either the quality or quantity of the flow.

The question whether a reasonable or unreasonable use of the water is being made, having regard to the common rights of others, is to be determined by the circumstances of each particular case, due consideration being given to the character and size of the watercourse, its location, and the uses to which it may be applied, as well as the general usage of the country in similar cases. (30 Am. & Eng. Enc. Law, 357.) Upon the question of the reasonableness of the use by the upper proprietor, the character and extent of his business, as well as the use to which the lower proprietor is putting the water, may be taken into consideration. Farnham, Waters, § 516.

A riparian owner has right to make a reasonable use of a stream for the operation of a mill or factory, and may even cast sewage or waste material therein, if he does not thereby cause material injury to public or private rights. 40 Cyc. 597; Gould, Waters, § 220.

As already stated, the question in such case is whether the use is, under all the circumstances, a reasonable one. If it is reasonable, then the lower owner cannot complain, even though the quality or quantity

of the flow of water may be impaired by the use of the upper owner. What is a reasonable use is, under all the authorities, primarily a question of fact, to be determined in view of all the circumstances of the case. Farnham, Waters, § 466; 30 Am. & Eng. Enc. Law, 357.

Manifestly, running streams cannot be used for commercial, manufacturing, or agricultural purposes, and retain their pristine clearness and purity. And as every riparian owner has the right to use the waters while on his land, it necessarily follows that the right of a riparian owner to have the water unimpaired as to quantity and quality is subject to the rights of other and upper riparian owners to make a reasonable use of the stream; and, if such use is reasonable, the fact that it incidentally impairs the purity of the water gives no cause of action. 30 Am. & Eng. Enc. Law, 382.

A riparian owner whose rights have been invaded is entitled to apply to and receive from the courts such relief as the facts in the particular case show him to be entitled to. He may maintain an action for damages against the wrongdoer for the detriment sustained. And in certain cases, where the legal remedies are inadequate, he may also be awarded injunctive relief.

The plaintiff of course has the burden of proof, regardless of the form of the action, and must establish the facts entitling him to relief by a preponderance of the evidence.

The liability of one charged with pollution of a stream is coextensive with the injury directly resulting from the acts causing such pollution. Hence, the wrongdoer cannot escape liability by showing that others have contributed to the pollution. Neither is he liable for any injury sustained by reason of pollution by others, unless he was acting in concert with them. Where the individual and separate acts of several riparian owners result in pollution of a stream, one of the number is not liable for all the injury suffered by another because of such pollution; each is liable to the extent only of the wrong committed by him. Chipman v. Palmer, 77 N. Y. 51, 33 Am. Dec. 566; Watson v. Colusa-Parrot Min. & Smelting Co. 31 Mont. 513, 79 Pac. 15; Mansfield v. Bristor, 76 Ohio St. 270, 10 L.R.A.(N.S.) 806, 118 Am. St. Rep. 852, 81 N. E. 631; Standard Phosphate Co. v. Lunn, 66 Fla. 220, 63 So. 430; Newark v. Chestnut Hill Land Co. 77 N. J. Eq. 23, 75 Atl. 645.

"To enable a riparian owner to maintain an action for damages for

the pollution of the stream, he must show not only that defendant has done some act which tends to injure the stream, and which he has no legal right to do, or which is in excess of his legal right so as to be an unreasonable use thereof, but also that the detriment of which he complains was the result of that cause. As stated in Columbus Gaslight & Coke Co. v. Freeland, 12 Ohio St. 392, to enable a landowner to recover for the pollution of water as for a nuisance he must have suffered a real, material, and substantial injury,—what amounts to such an injury being a question for the jury." Farnham, Waters, § 517. See also Tiede v. Schneidt, 105 Wis. 470, 81 N. W. 826.

A party who seeks injunctive relief against the pollution of a stream must not only show such pollution, but must further establish facts entitling him to such relief under the equitable principles generally applicable to injunctions. 30 Am. & Eng. Enc. Law, 369 et seq.

Bearing these principles in mind, we approach the issues presented for determination under the pleadings and the evidence in this case.

Plaintiff claims that he is entitled to recover damages for (1) the loss of profits, or value of the ice-cutting privilege; (2) the expense incurred one winter in cutting off about 5 inches from the bottom of the cakes of ice when such bottom part was filled with black specks; (3) the loss of the use of the land for pasturage purposes; and (4) the additional expense for cutting and hauling ice a distance of about 2 miles during the winter of 1913–14.

Plaintiff further claims that he is entitled to an injunction against the defendant, restraining it from continuing the acts which it is asserted caused the pollution of the stream.

While there are certain general statements and conclusions in plaintiff's testimony tending to show that defendant has polluted the water to some extent, as well as resulting injury to the plaintiff by reason of such pollution, we do not believe that even plaintiff's testimony when considered as a whole tends to establish all of plaintiff's contentions. And when all the evidence in the case is considered, we are satisfied that plaintiff has failed to sustain his burden of proof.

Plaintiff claims that his ice business was ruined, that he lost his customers, and that they purchased ice from his competitors. Yet, according to his own testimony, he continued to cut ice from the river upon his own premises until the city council in the winter of 1914

adopted an ordinance regulating ice cutting, which ordinance prohibited the cutting of ice from that portion of the Heart river within the city limits, east of the milldam, and required all persons desirous of cutting and packing ice for sale or distribution within the city of Dickinson to apply to the local board of health, and receive its approval as to the sanitary condition of such ice.

During the preceding winters he filled his ice house as usual with ice cut upon his own premises, and sold all the ice which he thus put up, with the exception that the bottom tier of the ice put up in the winter of 1912–13 was left at the end of the selling season of 1913.

So far as the evidence shows, plaintiff sold this ice at the usual prices. In fact, there is no contention that he was required to dispose of any of it at less than the customary price. Plaintiff did not personally conduct his ice business during the summer of 1914. In his testimony given upon the trial in November, 1914, he said: "I haven't been attending to the ice house this summer. I turned it over to another party and I haven't paid no attention to how much business he has been doing."

Plaintiff testified that he lost the business of the St. Charles Hotel because of the aversion of its owners to ice cut below the milldam. And he called Mr. Reichert, one of the proprietors, to substantiate this contention, but Reichert's testimony contradicts rather than corroborates plaintiff's testimony on this point.

Reichert testified in part:

Q. Before the mill company went in, where was the ice cut that you used in the hotel?

A. I wouldn't be able to say. I bought ice from McDonough and I bought ice from Carroll. I don't know. . . .

Q. As a matter of common knowledge in the town, you have known that a sewer at the mill discharged at the Heart river?

A. No, I didn't know that there was a sewer at the mill discharging into the Heart river.

Q. You know that the board of health had condemned the ice?

A. Yes.

Q. It was just a year ago, was it, Mr. Reichert, that you made a change in the ice? It was just this past summer, was it?

A. No, I haven't bought ice from McDonough for three or four years.

Q. Where do you get your ice?

A. Why, I buy it from Mr. Carroll.

While Reichert in answer to a leading question stated that he knew the board of health had condemned the ice, the testimony of one Rabe, a member of the local board of health, called as a witness in behalf of plaintiff, shows that while the board of health investigated the ice conditions in the spring of 1913, it did not attempt to stop the ice dealers from selling the ice put up that winter. He says: "By the time we got this analysis, it was too late, and the parties had put up their ice, and so we left them go for that year."

So far as the evidence shows, plaintiff's only competitor was Carroll, or rather Carroll Brothers, referred to in Reichert's testimony. Carroll Brothers maintained an ice house at a point between the defendant's mill and plaintiff's premises.

According to Rabe's testimony, Carroll Brothers put up their ice even in the winter of 1912–13 in front of their ice house, which, as already stated, was above plaintiff's premises, and below the milldam, and hence far more likely to be contaminated by the drainage from the mill than the ice put up on plaintiff's premises, and yet, according to Reichert's testimony, his firm bought Carroll Brothers' ice.

The defendant called as witnesses Professors Snyder and Hulbert. Professor Snyder for eighteen years occupied the chair of agricultural chemistry in the University of Minnesota. Professor Hulbert formerly occupied the position of chemist and bacteriologist of the Public Health Laboratory at the North Dakota University, and was, at the time of the trial of this action, and for some time prior thereto had been, engaged in similar work as an assistant to Professor Ladd at the North Dakota Agricultural College. Both chemists had made analyses of samples of ice cut by the plaintiff in the winter of 1912–13 in front of his ice house; and they both pronounced such ice to be good, wholesome ice, free from colon bacilli, and entirely fit for use by human beings. Both chemists had also made analyses of several samples of water obtained at various times during the spring, summer, and fall, both from above the milldam and in front of plaintiff's ice house; and they both testi-

fied that there was no appreciable difference in purity between the water taken above the milldam and the water taken at a point opposite plaintiff's ice house. Professor Hulbert personally obtained the samples of ice and water which he analyzed.

The undisputed evidence shows that no chemicals were used in washing the wheat, but that the process consisted in cleansing or washing the wheat with water. This washing process was not used as a substitute for other cleansing processes usually employed, but was used in addition thereto. All wheat was run over cleaners to take out the loose refuse, such as dirt and foul seed, before it went into the washer. The washing process was merely used for the purpose of loosening and removing whatever particles of dirt might be adhering to the kernels of the wheat.

The plaintiff testified that one winter the bottom of the ice became filled with black specks which looked like cockle seed, and that he was required to cut off about 5 inches of the bottom of each cake of ice.

Plaintiff further testified that this never occurred before the mill was built, and apparently it occurred only during one winter afterwards,— at least there is only one winter that he was required to cut off a portion of the bottom of the cakes of ice. There is no evidence as to the nature of the black specks, except plaintiff's statement that the ice was spotted "with what we thought was cockle, looked something like cockle."

The undisputed testimony of the manager of the mill, however, shows that cockle seed was never discharged into the water, but was cleaned out by other processes before the wheat was washed, and that the washing process merely removed particles of dirt adhering to the kernels which had not been removed by the cleaners. And both chemists contradicted the conclusions drawn by the plaintiff.

In this connection it should be noted that, according to plaintiff's own testimony, the railroad dam which forms the pond where plaintiff has been getting his ice supply is about 7 feet high. There are no gates in the dam, but it is built so that there is no overflow until the water flows over the top of the dam. The dam was constructed five or six years prior to the commencement of this action, and was abandoned about two or three years after its construction. It has not been kept in repair since it was abandoned. Hence, the dam was constructed only

about one or two years before the mill was constructed, and abandoned about the time the mill was constructed, or within a year thereafter. Plaintiff testified that the railroad company put an addition or cap on the dam after it was built; that this cap or addition was "knocked off" by the ice pressure, and has not been replaced; and that its removal resulted in lowering the water in front of plaintiff's ice house. But the evidence does not show the height of the "cap," when it was removed, or the extent to which the water was lowered by reason of its removal.

Dr. Davis, the local health officer, also testified that the cinders and small particles of unconsumed coal emitted by the various plants in Dickinson could and would be carried into the river on plaintiff's premises by the prevailing winds. And the sediment in a large Mason jar marked exhibit "E" offered by the plaintiff, and part of the record on this appeal, has every indication of being particles of coal, rather than anything which would ordinarily be found adhering to kernels of wheat.

Plaintiff offered in evidence the ordinance regulating the cutting of ice, and contends that this ordinance was adopted because the city authorities had determined that the drainage from the mill polluted the waters in the Heart river and rendered the ice therein unfit for human use. In support of this contention plaintiff called Dr. Davis and one Rabe, two members of the local board of health, who testified in regard to the reasons for the action of the city officials.

It is a rule of construction universally adopted, that courts are not concerned with the wisdom of legislative policy or the motive or necessity for legislative acts, except in so far as these may furnish some aid in ascertaining the intent of the legislative body in case the language of an enactment is ambiguous or doubtful. It surely cannot be contended that a party who is injured by the enactment of a prohibitory or regulatory measure by a legislative body is entitled to recover damages against the person or persons whose conduct was responsible for or created the public sentiment or necessity which led to the enactment of the measures. Nor does it seem that the reasons which actuate a legislative body in enacting a measure can be deemed to have any particular probative force in a controversy between private parties and involving private rights, even though the reasons for the enactment are recited in the measure itself. It is for the legislative body to de-

termine what the law shall be, and for the courts to determine what it is. It is solely for the legislative body to determine whether the facts, existing or prospective, require certain legislation to be enacted. The courts are not concerned with whether the reasons which actuated the legislative body to adopt a law were wise or unwise, or whether the premises on which legislative judgment was exercised were correct or incorrect. These are matters to be determined solely by the legislative body itself, and may be considered by the court only to ascertain the legislative intent in case the enactment is couched in language of ambiguous or doubtful meaning. Sedgwick (Sedgw. Stat. & Const. Law, pp. 56, 57), in discussing what weight and effect should be given to facts recited by a lawmaking body in the preamble of an enactment, says: "As between individuals whose rights are affected, the facts recited ought not to be evidence. We well know that such applications are made frequently *ex parte*. Once adopt the principle that such facts are conclusive, or even prima facie evidence against private rights, and many individual controversies may be prejudged and drawn from the sanctions of the judiciary into the vortex of legislative usurpation. The appropriate functions of the legislature are to make laws to operate on future incidents, and not a decision or forestalling of rights accrued or vested under previous laws. Such a preamble is evidence that the facts were so represented to the legislature, and not that they are really true."

Even if the enactment of the ordinance could be considered, however, it is difficult to see wherein it would strengthen plaintiff's cause. It seems rather far-fetched to say that the ordinance was passed because defendant polluted the water in the stream. If the city authorities deemed that the discharge of drainage from defendant's mill tended to pollute waters in the stream so as to render them dangerous to public health, it seems as though the logical thing for them to have done under the circumstances would have been to prevent such pollution, rather than to permit the pollution to continue and prohibit the cutting of ice.

The evidence in this case, however, shows that there were other sources of possible pollution below the milldam which of themselves furnished adequate reason for the adoption of the ordinance in question. For instance it is shown that South Dickinson lies between the milldam and plaintiff's premises. That there are in all three or four hundred

German, Russian, Bohemian, and Polish families living here. There are no sewers, and the houses have privies, and there are also barns situated on the bank of the river. The land slopes toward the river. The surface drainage from this town, as well as the seepage from the privies, discharge into the river. Cattle and horses pastured on plaintiff's premises, and the town herd containing some 80 to 100 head of cows, are permitted to wade into the river. There are piles of manure along its banks. There is a brickyard which drains into the river.

Professor Snyder in his testimony gave a graphic description of these sources of pollution.

He testified in part as follows:

Q. Now, what was the first source of contamination which you discovered below the mill?

A. At the brickyard there is a cut through which the clay material is brought to the brickyard, affording a natural drainage for a large portion of the brickyard area, and there is also situated on this gully an open privy the drainage of which leads down a channel into the river. That was the first one.

Q. You don't know how many men are employed in that brickyard?

A. I don't . . . but I would judge from the size of the works there would be a large number.

Q. Going on down the stream, what else did you discover?

A. Buildings located near the bank, barns, the natural drainage directly into the river, also privies of buildings further down; also located a small flour mill a little off, but where the drainage would find its way into the river. Also general conditions such as was described by the doctor (Dr. Davis) this morning.

This testimony was corroborated by Professor Hulbert, who testified to other sources of pollution observed by him, including piles of manure and the carcass of a horse.

Dr. Davis, the local health officer who apparently was largely responsible for the enactment of the ordinance, admits that these other possible sources of pollution would have justified the enactment of the ordinance.

On his cross-examination Dr. Davis testified in part:

Q. Assuming that his (plaintiff's) ice house is below the pond where

the surface drainage from all of South Dickinson enters the Heart river, would'nt you say that that situation alone would be sufficient grounds to pass the ordinance there?

A. I certainly would. . . .

Q. So that, entirely independent of the Russell Mill Company's sewerage, there was another distinct ground upon which you would have been justified in passing that regulation?

A. I think so.

The plaintiff testified that the live stock was unwilling to drink the water and would come to the well near the house, that he ceased to take stock for pasture, and pastured only his own stock, which he watered at the well, and cut the grass, not eaten, for hay. He also testified that the land was more valuable, and capable of earning larger profits when used for pasture purposes. And it is therefore contended that this loss of profit was due to defendant's acts. The plaintiff's own testimony shows that he had other water available for watering the stock; the uncontradicted testimony of the chemists is to the effect that the water was not necessarily unfit even for human use. So far as any pollution of the water which rendered it distasteful to the cattle is concerned, it is at least as, if not more, probable, that it resulted from the stagnancy caused by the dam constructed below plaintiff's property, and the surface drainage from South Dickinson, and the piles of manure on the banks of the river, some of which were located on plaintiff's own land, as by any acts of the defendant.

Plaintiff claims that he is in any event entitled to an injunction restraining defendant from depositing sewage in the river, and calls our attention to certain sections of the Penal Code relating to the fouling of public waters. We are at a loss to understand how the penal statutes are involved. If defendant has violated any provisions of the Penal Code it is subject to the penalties provided by law. But such penalties do not inure to the benefit of the plaintiff. He must recover, if at all, by proof of invasion of his own rights.

The remedy by injunction, being preventive, is intended to prevent a continuance of an existing and continuing pollution, or a threatened pollution; and past acts or resulting injuries are not in themselves grounds for injunctive relief, unless it appears that the acts or injuries shown will probably continue or recur. Gould, Waters, §§ 512 et seq.

The trial of this action was commenced on November 27, 1914, and concluded on the day following. Upon the trial defendant's attorney stated, and its manager testified, that the defendant was then engaged in constructing a septic tank; that the latest and most approved scientific apparatus and appliances for purification were utilized in such construction; that the same would completely deodorize and destroy all bacteria and germs; that a large force of men was then at work on such construction; and that the tank would be fully completed and in use within ten days or two weeks from that time. The findings of fact were not signed by the trial court until August 31, 1915, and in these findings the court found that "defendant installed a septic tank at its said mill and elevator; and that since that time it has not discharged, and is not now discharging into the Heart river, any sewage from its said mill or elevator, and by reason of said instalment of said septic tank by said defendant it has ceased to discharge into the Heart river any sewage matter such as it was discharging there into at and prior to the time of the commencement of said suit."

It is asserted that this finding is not supported by the evidence. There is, it is true, no evidence in the record showing the installation of a septic tank prior to the commencement of the trial. But the evidence does show that at the time of the trial a large force of men was at work constructing said tank, and that the same would be fully completed within the next ten days or two weeks. This was not only established by the testimony of the defendant's manager, but was also contained in a statement of the defendant's attorney, assuring the court that such tank would be fully constructed and in use within such time. It must be presumed "that the ordinary course of business has been followed." Comp. Laws 1913, subd. 20, § 7936.

There is no contention in the record that the tank has not as a matter of fact been fully constructed and put into use as found by the trial court. No request was made by the plaintiff for leave to show that the proposed construction had not been completed, although, as already stated, findings were not made or judgment entered until almost a year after the trial.

We concur fully in the findings of the trial court. In our opinion plaintiff has wholly failed to establish his alleged cause of action

against the defendant. If any error was made it was in allowing plaintiff $100 as nominal damages.

In this opinion we have adopted the theory on which the case has been argued, but we deem it proper to say that we are by no means satisfied that a riparian owner of land situated within the limits of a city at a point with respect to residences and manufacturing establishments therein, such as the evidence shows plaintiff's premises to be situated, can legally claim that the cutting of ice thereupon is a reasonable use of the waters in the stream.

Certain questions of practice with respect to the extent of review on this appeal have been raised. As the result in this case must be the same regardless of the ruling on such questions, it becomes unnecessary to consider them.

The judgment appealed from must be affirmed.

It is so ordered.