CHARLES BRADLEY *vs.* SARAH M. WARNER *et al.*

PROVIDENCE—OCTOBER 28, 1898.

PRESENT : Matteson, C. J., Stiness and Tillinghast, JJ.

(1) *Presumption. Relocation of Dam. Flowage.*

A. conveyed in fee to B., as trustee for grantor and others, certain lots of land with an ice-house thereon, and with privilege of taking ice from an artificial pond formed by building a dam at location stated in the deed, such privilege to continue as long as the pond should exist, but reserved to the owner of the dam, forever, the right to flow the granted lots, and a right to draw water from the pond when necessary. Complainant's title was by deeds expressly including the ice privilege mentioned. The dam was subsequently destroyed, and one of complainant's predecessors in title constructed a new one further up the stream; but the pond, so raised, did not flow back as far as the former pond. Respondents derived their title to other lots by deeds from A., executed after the deed to B.

had been recorded, their lots being above the new dam and on either side of the pond. The water was polluted by matter from these lots, and on a bill to enjoin such pollution:—

*Held,* that the first conveyance gives rise to a presumption that the easement to have the dam continued, and the lots flowed, was to be co-extensive with the estate in the lots and not to be restricted to the life of the dam, and that the dam might be repaired or rebuilt when necessary.

(2) *Easement.*

*Held,* further, that the change in the location of the dam, the area flowed being no greater than that flowed by the former dam, was not matter of defence to the bill; the respondents not being injured thereby, the change was immaterial as to them and did not extinguish the easement.

(3) *Pollution of Stream.   Injunction.*

*Held,* further, that if the rights of others had been infringed by the acts stated, such infringement did not concern the respondents.

*Held,* further, that if the water became unfit for ice making because polluted from other sources before it reached the pond, that fact was not available as a defence in the present suit.

*Held,* further, that neglect of a former tenant of the complainant, by which manure accumulated on premises adjacent to the ice-house and water therefrom flowed into the pond, constituted no defence to the bill.

*Held,* further, that an injunction against the pollution of the water by the respondents should be granted.

BILL IN EQUITY to restrain the pollution of water ponded for the purpose of making ice.   Heard on bill, answer, and proofs.

MATTESON, C. J.   This is a bill for an injunction to restrain the respondents from polluting the complainant's ice-pond, and for an account to be taken of the damages suffered by the complainant from the pollution of the pond in the past.

On October 23, 1872, Lysander Flagg, the owner of the land in East Providence platted as the Medbery and Lawton Plat, and as the Lawton Farm Plat in Riverside, by his deed of that date conveyed to George Smith, as trustee for the grantor and others, the lots numbered 333, 334, 335, 336, on the Lewis Farm Plat, and lots numbered 79, 80, 81, 82, 83, 131, 133, and 134 on the Medbery and Lawton Plat, together with the ice-house then building on lots 81 and 82; " also the exclusive privilege of cutting and taking ice from the artificial

pond of water made by building a dam by said grantee on or between lots numbered 245, 247, 249, 251, and 254, and lots numbered 246, 248, 250, 252, and 255, as said lots are laid out and described on the aforesaid Plat of Villa Lots on the Medbery and Lawton Farms near Cedar Grove, as long as said pond shall exist, reserving, however, to the present owner or future owners of the aforesaid dam, and to their heirs and assigns forever, the right of flowage upon or over any or all of the afore-granted lots, and the further right to draw the water from said pond whenever it may be necessary." All the subsequent conveyances through which the complainant derives title to his land, including the deed to him dated July 26, 1890, expressly include the ice privilege granted in the deed from Flagg to Smith, trustee, as above set forth.

About sixteen or seventeen years before the filing of the bill, the dam referred to in the deed from Flagg to Smith, trustee, having been carried away, the Riverside Ice Company, a predecessor in title of the complainant, proceeded up the brook about five hundred feet to a point on Fenner avenue, a platted street which has never been graded or accepted as a public highway, where an ancient bridge, part of an old driftway, crossed the brook, and there constructed a new dam, without the leave or license of the then owners of the lots on the Medbery and Lawton Plat abutting on Fenner avenue in that part of it where the dam was built, and against the objection and protest of George M. Johnson, the owner of the lots on which was subsequently erected a wing wall to sustain the dam. The rollway of the new dam is two inches lower than the rollway of the old dam, so that the pond raised by the new dam does not flow back up the stream so far as the pond raised by the old dam.

The respondents each derive title to the lots owned by them respectively through mesne conveyances from Flagg, the deeds of these lots having been executed subsequently to the recording of the deed from him to Smith, trustee of the premises which the complainant owns. The lots of the respondents are above the sites of both the old and the new dam, on opposite sides of the pond raised by the new dam.

The sources of pollution complained of are a privy and sink-drain-pipe on the Warner property, and a drain-pipe on the Peck property placed there before the occupation of the present tenant of the latter property began.

(1)      The principal question which has been raised is as to the nature of the ice privilege conveyed by the deed from Flagg to Smith as trustee. The respondents contend that the grant was merely a license to cut the ice, limited to the existence of the particular pond raised by the dam to be built by the grantee as stated in the deed; that, that dam having been partially destroyed by the elements and rendered useless in 1881 or 1882, it was competent for Flagg to revoke the license and extinguish the right, which he did by destroying the remainder of the dam, removing the stone, timbers, &c., and by subsequently conveying some of the lots, on which the dam had been located, without reservation and free from encumbrance. The complainant, on the other hand, contends that the language is sufficient, by implication, at least, to create an easement in fee in favor of the grantee to have the lots conveyed to him flowed to the extent covered by the pond raised by the dam; since the privilege of cutting and taking ice from the pond clearly could not be enjoyed without the raising and maintaining of a pond on which the ice was to form, and that the grant of a thing carries with it all things as included without which the thing granted cannot be enjoyed. And he further contends that the words "as long as said pond shall exist" cannot operate to cut down the easement which is annexed to the fee in the lots and restrict it to the pond formed by the dam originally erected; that, if such had been the intention, the language used would have been, doubtless, "as long as said dam shall exist;" that the intention evidently was to grant the ice privilege for as long a time as in the nature of things it could be enjoyed.

We are inclined to the view taken by the complainant. The conveyance of the lots with the ice-house being in fee, with authority to the grantee to enter on the land of the grantor and erect a dam for the purpose of creating the pond on which to cut the ice, gives rise to a presumption that the

easement to have the dam continued and the lots flowed was to be co-extensive with the estate in the lots, and hence that it was not to be restricted merely to the life of the dam, but that the grantee and his successors in title should have the right to maintain the dam, and for that purpose to enter upon the land of the grantor to repair or rebuild it when necessary. *Huntington* v. *Asher*, 96 N. Y. 604, was a case similar in this respect to the present. That was a case, not of a strict easement, but of a *profit a prendre*, the pond on which the ice privilege was to be exercised not belonging to the owner of the privilege. It was held that, though the owners of the pond were not bound to maintain the dam, they were not authorized to destroy it or prevent its repair, and that the grant of the privilege carried with it, and gave to the owner of the estate to which the privilege was appurtenant, the right to repair and rebuild the dam.

(2)    We do not think that the change in the location of the dam, so long as the area flowed by the new dam is no greater than that flowed by the old, is a fact of which the respondents can avail themselves as a defence. In the absence of any injurious consequences to the respondents resulting from the change, the change, so far as they are concerned, is immaterial, and does not have the effect to destroy or extinguish the easement. In *Kidd* v. *Laird*, 15 Cal. 161, it was held that one entitled to divert a given quantity of water of a stream had the right to change the point of diversion at pleasure, if the rights of others were not injuriously affected by the change. The court, after citing authorities, remarks: "These authorities show conclusively that in all cases the effect of the change on the rights of others is the controlling consideration, and that in the absence of injurious consequences to others any change which the party chooses to make is legal and proper." In *Cary* v. *Daniels*, 8 Met. 466, in which the parties derived title to their respective mills by conveyances from tenants in common, it was held that the defendant was entitled to remove his dam to a point lower down the stream, if thereby he made only the same appropriation of the stream made by his dam and mill as they stood before.

In *Barber* v. *Nye*, 65 N. Y. 211, there was a grant of a privilege to build a dam on the land of the grantor "at any place within forty rods of the great falls on said creek." The dam so constructed by the grantees was removed, and a new one constructed by the defendant, who had succeeded to the title of the grantees, on his own land about thirty rods below the original dam. There being no increased flow of water on the complainant's land by the new dam, it was held that the defendant had the right to make the change. See also Gould on Waters, 2 ed. § 344, where it is laid down that the owner of an easement may at his pleasure make alterations or improvements, or increase the capacity of machinery which is propelled by the water, if the burden upon the servient estate is not increased. So it is not necessary that the dam should have been maintained for the whole period upon the same spot, if the lines of the actual enjoyment of the easement are not changed.

(3) If, in the erection and maintenance of the new dam, the complainant's predecessors in title and he have infringed the rights of others, such infringement does not concern the respondents.

The respondents insist that an injunction ought not to be granted because, as they allege, the water is unfit for ice-making purposes. They allege that the brook which flows into the pond receives the drainage of a territory two and one-half to three miles in length, passing through a swamp and through meadows and pastures where animals pollute it, and that filth from barns, hen-yards, pig-pens, and the wash of streets flows into it; that there is a pond higher up on the stream which is turned into this pond, and that it receives the silt and sediment accumulated in the higher pond which the pipes in the new dam are inadequate to properly drain, so that there is a constantly increasing sediment which must pollute the water. If it be conceded that these contentions are correct, we do not think that they furnish a defence. This question was considered by the court in *Richmond Mfg. Co.* v. *Atlantic De Laine Co.*, 10 R. I. 106, and it was there held that, though the refuse from certain stables, drains,

privies, and tanneries had been emptied into the river between the mills of the plaintiff and the respondent, it was no excuse for the pollution of the stream by the respondent. And see also Gould on Waters, 2 ed. § 222, as follows : "The fact, however, that the stream is fouled by others, even by a large number of persons, is not a defence to a suit to restrain the fouling by one ; and if, at the time when the defendant began to pollute, the stream was already so much fouled by others as to be unfit for plaintiff's use, the action would still be maintainable."

Nor do we see that the fact claimed by the respondents, to be established by the evidence, that the water has been polluted by the neglect of a former tenant of the complainant to promptly remove manure from the premises adjacent to the ice-house, whereby it was suffered to accumulate and the rain-water falling upon it to run into the pond, constitutes a defence. The evidence does not show that the accumulation of manure was with the complainant's knowledge or permission, and even if it were it would not avail the respondents. In *Silver Spring Bleaching and Dyeing Co.* v. *Wanskuck Co.*, 13 R. I. 611, it was held that the pollution of the stream by the complainant was entirely a matter between him and the owners below, unless the pollution made the river injurious to public health, or otherwise became an injury to public rights, in which event it was for the proper officers of the government to intervene.

An examination of the testimony leads us to the conclusion that the evidence of pollution of the water of the pond by both respondents is sufficient to warrant the granting of an injunction.

*Stephen O. Edwards, Walter F. Angell, Seeber Edwards, and Albert Gerald,* for complainant.

*Edward C. Dubois,* for respondent.