# JOHN McDONOUGH, Appellant, v. RUSSELL-MILLER MILLING COMPANY, a Corporation, Respondent.

### (182 N. W. 251.)

**Judgment — notwithstanding verdict for riparian owner, proper where he was not entitled to recover damages for pollution of ice field by upper owner.**

The plaintiff is the owner of certain lands, within the boundaries of the city of Dickinson, traversed by the Heart river. He brought this action to recover damages against the defendant, who is an upper riparian owner, for pollution of the stream. In this action the plaintiff was awarded damages for the acts of the defendant: (1) Rendering unsalable the ice on the river on plaintiff's premises; (2) depreciating the rental value of a pasture adjacent to the river; and (3) interfering with the enjoyment of plaintiff's dwelling house. Prior to the time involved in this action, the city of Dickinson had enacted an ordinance prohibiting the cutting of ice from a certain portion of Heart river within the city limits. Plaintiff's premises were within such prohibited district. It is *held:*

1. That the trial court, on motion for judgment notwithstanding the verdict or for a new trial, properly ruled that plaintiff could not recover damages for pollution of his ice field.

**Judgment — judgment of dismissal notwithstanding verdict held improper in action for pollution of waters by upper riparian owner.**

2. That as to the other two items of damages, it cannot be said as a matter of law that plaintiff has no cause of action; hence, the trial court should not have ordered judgment in favor of the defendant for a dismissal of the action, but should have ordered a new trial of the action.

**Abatement and revival — death held not to abate action for damages by pollution of stream.**

3. That such action does not abate by the death of the plaintiff.

Opinion filed January 25, 1921. Rehearing denied March 26, 1921.

From a judgment of the district court of Burleigh County, *Nuessle,* Special Judge, plaintiff appeals.

Reversed and remanded for a new trial.

*T. F. Murtha* and *C. H. Starke,* for appellant.

After a judgment has been rendered in an action and while such judgment remains in full force and effect, a court does not possess the power to dismiss the action. Todd v. Todd, 7 S. D. 174, 63 N. W. 777; Barnett v. Will (N. D.) 166 N. W. 511.

"The theory of the law is that the infliction of past damages will cause the abatement of a temporary nuisance; if it does not successive actions may be maintained." R. Co. v. Pattison, 67 Ill. App. 351; 11 Dec. Dig. (Judgment) § 606; Bowers v. Boom Co. 81 N. W. 208; Bennett v. Marion (Iowa) 93 N. W. 558; Sanitary Dist. v. Ray (Ill.) 64 N. W. 1048; R. v. Church (U. S.) 34 L. ed. 784.

The recovery of the judgment in the first action settled the fact that the deposit of sewage into the Heart river was a nuisance for which plaintiff might recover damages. 2 Black, Judgm. § 742; Casebeer v. Mowry, 93 Am. Dec. 766.

*Young, Conmy, & Young,* for respondent.

The verdict is excessive. Durham v. Eno Cotton Mills (N. C.) 7 L.R.A.(N.S.) 321, 54 S. E. 453; 27 R. C. L. 1216.

PER CURIAM: This action was commenced by the plaintiff in January, 1919, to recover damages for the alleged pollution by the defendant of the waters in Heart river. The case was tried to a jury, and resulted in a general verdict in favor of the plaintiff in the sum of $9,852.98. Judgment was entered pursuant to the verdict. Defendant moved for judgment notwithstanding the verdict or for a new trial. The trial court ordered judgment in favor of the defendant notwithstanding the verdict. Judgment was so entered, and the plaintiff appealed.

This litigation, or rather another phase thereof, was before this court in a former action. McDonough v. Russell-Miller Mill. Co. 38 N. D. 465, 165 N. W. 504. Both parties are riparian owners upon the Heart river within the limits of the city of Dickinson. The plaintiff owns a tract of land traversed by the Heart river. The tract originally consisted of 160 acres. Later plaintiff platted a portion of it, on both sides of the river, as an addition to the city of Dickinson, and sold some of it,

for residence lots. Of the remainder, 40 acres are under cultivation, and about 80 acres in pasture. The plaintiff also used to maintain an ice house, which is situated on the bank of the river on this land. Immediately below plaintiff's land is a concrete dam constructed by the Northern Pacific Railroad Company about 1908 or 1909. This dam is situated about 2,060 feet below plaintiff's ice house, and he cut ice from the pond formed above the dam.

The defendant owns a tract of land up stream from plaintiff's premises. In 1910 the defendant constructed a large flour mill upon said tract of land. The drainage from the mill led into the river at a point 6,350 feet above plaintiff's ice house. The plaintiff claimed that this drainage polluted the waters of the Heart river. And in June, 1914, he brought an action against the defendant, wherein he claimed that this drainage polluted the waters of the Heart river, and caused them to become "absolutely unfit for any use in connection with any human or animal food or drink, and rendered all ice cut on said pond unfit and dangerous for use to which ice is commonly used, and valueless and unsalable, thereby destroying utterly the value and profitableness of said ice business" (38 N. D. 471), and asked that he be awarded damages in the sum of $40,600 for: (1) The loss of profits of value or the ice cutting privilege; (2) the expense incurred one winter in cutting off about five inches from the bottom of the cakes of ice when such bottom part was filled with black specks; (3) the loss of the use of the land for pasturage purposes; and (4) the additional expense for cutting and hauling ice a distance of about two miles during the winter of 1913–14; and that defendant be enjoined from continuing the acts which it was asserted caused the pollution of the stream. 38 N. D. 474. A trial of that action resulted in a judgment in favor of the plaintiff for $100, allowed as and for nominal damages, and denial of the injunctive relief prayed for. That judgment was affirmed by this court. 38 N. D. 465. The drainage from the mill, complained of in that case, consisted of certain water wherein wheat had been washed, and the discharge of a certain water-closet used by the employees of the mill. 38 N. D. 471. Upon the trial of that action it was shown that the defendant was constructing a septic tank; that the latest and most approved scientific apparatus and appliances for purification were utilized in such construction; that the same would completely deodorize

and destroy all bacteria and germs; that a large force of men was then at work on such construction; and that the tank would be fully completed and in use within ten days or two weeks from that time. And in the findings of fact, signed several months later, the trial court found that the defendant had "installed a septic tank at its said mill and elevator, and that since that time it has not discharged, and is not now discharging, into the Heart river, any sewage from its said mill and elevator." 38 N. D. 482. The defendant pleaded the judgment in the former action as a bar in this action, and the judgment roll and the transcript of the evidence in that action was offered and received in evidence in this case, and the court was requested to take judicial notice of the decision of this court in the former action.

In this action plaintiff seeks to recover damages for pollution, alleged to have taken place since the trial of the former action. It is contended that the septic tank did not do the work it was supposed to do, and that sewage was discharged into the river; that the defendant put manure on its dam, and repaired breaks therein by filling in manure; that oil and grease was discharged into the water, and that refuse, sweepings and waste matter from the mill were dumped into the river, and were placed upon the banks of the river so that they found their way into the river. As a result thereof plaintiff claims that, since the trial of the former action and up to the commencement of this action, he was damaged, and entitled to judgment, as follows: "$7,500 for the pollution of the ice field; $3,000 reduced rental of pasture; $2,000 damages for interfering with the enjoyment of his dwelling and premises by reason of the bad odors; $5,000 damages for preventing the sale of said lands; $5,000 exemplary damages." No evidence whatever was offered as to the loss of sale of the premises. And at the close of the testimony the trial court announced that in his judgment there was no room for the allowance of exemplary damages. There was submitted to the jury for determination whether, and to what extent, plaintiff had been damaged: (1) By the pollution of his ice field so that he could not cut ice himself or sell or lease the ice cutting privilege to others; (2) lessened rental value of his pasture; and (3) interference with the use and enjoyment of his dwelling house by reason of bad odors. In answer to special interrogatories the jury found that the value of the untilled land for pasturage purposes was $800 per year, and that its

value for haying purposes was $300 per year; that plaintiff has sustained damages in the sum of $1,602.98 on account of the bad odors which prevented his full enjoyment of the dwelling house. The verdict returned in favor of the plaintiff was for $9,852.98.

We are entirely satisfied that the verdict cannot stand, and that the trial court was correct in so far as he held that the plaintiff could not recover any damages for the alleged damages occasioned by pollution of the ice field. The plaintiff testified that in the course of the years he had taken this ice and sold it to the people of Dickinson and vicinity; and that the ice cutting privilege during the years involved in this action was worth from $1,500 to $2,000 per year. Yet the evidence shows that prior to the time involved in this action, the city of Dickinson enacted an ordinance prohibiting the cutting of ice on Heart river at any point within the limits of the city of Dickinson. That ordinance was in effect before the first action was brought. It was considered, and its provisions referred to, in our decision in that case. See, 38 N. D. 478. That action was tried anew in this court. There was no difference of opinion among its members as to either the facts or the law. The ordinance by its terms, (a) "prohibited the cutting of ice from that portion of the Heart river within the city limits, east of the milldam," and, (b) "required all persons desirous of cutting and packing ice for sale or distribution within the city of Dickinson to apply to the local board of health, and receive its approval as to the sanitary condition of such ice." 38 N. D. 475. In that action the plaintiff contended that the ordinance had been "adopted because the city authorities had determined that the drainage from the mill polluted the waters in the Heart river and rendered the ice therein unfit for human use. In support of this contention plaintiff called Dr. Davis and one Rabe, two members of the local board of health, who testified in regard to the reasons for the action of the city officials." 38 N. D. 478.

In disposing of that contention this court said:

"It is a rule of construction universally adopted, that courts are not concerned with the wisdom of legislative policy or the motive or necessity for legislative acts, except in so far as these may furnish some aid in ascertaining the intent of the legislative body in case the language of an enactment is ambiguous or doubtful. It surely cannot be con-

47 N. D.—16.

tended that a party who is injured by the enactment of a prohibitory or regulatory measure by a legislative body is entitled to recover damages against the person or persons whose conduct was responsible for or created the public sentiment or necessity which led to the enactment of the measures. Nor does it seem that the reasons which actuate a legislative body in enacting a measure can be deemed to have any particular probative force in a controversy between private parties and involving private rights, even though the reasons for the enactment are recited in the measure itself. It is for the legislative body to determine what the law shall be, and for the courts to determine what it is. It is solely for the legislative body to determine whether the facts, existing or prospective, require certain legislation to be enacted. The courts are not concerned with whether the reasons which actuated the legislative body to adopt a law were wise or unwise, or whether the promises on which legislative judgment was exercised were correct or incorrect. These are matters to be determined solely by the legislative body itself, and may be considered by the court only to ascertain the legislative intent in case the enactment is couched in language of ambiguous or doubtful meaning. Sedgwick (Sedgw. Stat. & Const. Law, pp. 56, 57), in discussing what weight and effect should be given to facts recited by a lawmaking body in the preamble of an enactment, says: 'As between individuals whose rights are affected, the facts recited ought not to be evidence. We well know that such applications are made frequently ex parte. Once adopt the principle that such facts are conclusive, or even prima facie evidence against private rights, and many individual controversies may be prejudged and drawn from the sanctions of the judiciary into the vortex of legislative usurpation. The appropriate functions of the legislature are to make laws to operate on future incidents, and not a decision or forestalling of rights accrued or vested under previous laws. Such a preamble is evidence that the facts were so represented to the legislature, and not that they are really true.'

"Even if the enactment of the ordinance could be considered, however, it is difficult to see wherein it would strengthen plaintiff's cause. It seems rather far-fetched to say that the ordinance was passed because defendant polluted the water in the stream. If the city authorities deemed that the discharge of drainage from defendant's mill tended to pollute waters in the stream so as to render them dangerous

to public health, it seems as though the logical thing for them to have done under the circumstances would have been to prevent such pollution, rather than to permit the pollution to continue and prohibit the cutting of ice.

"The evidence in this case, however, shows that there were other sources of possible pollution below the milldam which of themselves furnished adequate reason for the adoption of the ordinance in question. For instance it is shown that South Dickinson lies between the milldam and plaintiff's premises. That there are in all three or four hundred German, Russian, Bohemian, and Polish families living here. There are no sewers, and the houses have privies, and there are also barns situated on the bank of the river. The land slopes toward the river. The surface drainage from this town, as well as the seepage from the privies, discharge into the river. Cattle and horses pastured on plaintiff's premises, and the town herd containing some 80 to 100 head of cows, are permitted to wade into the river. There are piles of manure along its banks. There is a brickyard which drains into the river.

"Professor Snyder in his testimony gave a graphic description of these sources of pollution.

"He testified in part as follows:

" 'Q. Now, what was the first source of contamination which you discovered below the mill?

" 'A. At the brickyard there is a cut through which the clay material is brought to the brickyard, affording a natural drainage for a large portion of the brickyard area, and there is also situated on this gully an open privy the drainage of which leads down a channel into the river. That was the first one.

" 'Q. You don't know how many men are employed in that brickyard?

" 'A. I don't . . . but I would judge from the size of the works there would be a large number.

" 'Q. Going on down the stream what else did you discover?

" 'A. Buildings located near the bank, barns, the natural drainage directly into the river, also privies of buildings further down; also located a small flour mill a little off, but where the drainage would find its way into the river. Also general conditions such as was described by the doctor (Dr. Davis) this morning.'

"This testimony was corroborated by Professor Hulbert, who testified to other sources of pollution observed by him, including piles of manure and the carcass of a horse.

"Dr. Davis, the local health officer who apparently was largely responsible for the enactment of the ordinance, admits that these other possible sources of pollution would have justified the enactment of the ordinance.

"On his cross-examination Dr. Davis testified in part:

" 'Q. Assuming that his (plaintiff's) ice house is below the pond where the surface drainage from all of South Dickinson enters the Heart river, wouldn't you say that that situation alone would be sufficient grounds to pass the ordinance there?

" 'A. I certainly would. . . .

" 'Q. So that, entirely independent of the Russell Mill Company's sewerage, there was another distinct ground upon which you would have been justified in passing that regulation?

" 'A. I think so.' "

There is no contention here, nor was there any contention in the former action, that the ordinance, for any reason, is invalid. Nor is there any contention that it has been repealed or altered. On the contrary all reference to it during the course of the trial implied that it was in full force and effect. An ordinance of a city is a rule of conduct within its corporate limits, and every person is as much bound to obey and observe a law laid down by the city council as one laid down by the legislature. Dorrame v. Omaha & C. B. Street R. Co. 105 Neb. 196, 180 N. W. 90; Memphis Steel R. Co. v. Haynes, 112 Tenn. 712, 81 S. W. 374. Hence, we have the situation that the plaintiff seeks, and was awarded, damages because he was prevented from doing, or it became unprofitable for him to do something which was forbidden by law. Manifestly he could recover no damages because he was prevented from violating, or because it became unprofitable for him to violate, the law.

There is some evidence tending to show pollution of the waters in Heart river by the defendant by placing manure on top of its milldam; by using manure to fill breaks in such dam; by dumping refuse into the river, and by sewage going into the river at a time when the septic tank was out of order. While as to some of these things the evidence is

not strong, we believe there is sufficient evidence to make it a question for the jury whether there was or was not pollution by the defendant. A majority of the members of the court are, also, of the opinion that the evidence is sufficient to sustain a verdict in favor of the plaintiff for damages by reason of lessened rental value of his premises for pasturage purposes, and, also, for the interference with the enjoyment by plaintiff of his dwelling. The members of the court, who join in this opinion, however, are agreed that as to the former there is no way to determine upon the record here what the jury allowed therefor in their verdict in this case. The plaintiff testified that the pasture was sufficient for twenty head of stock, and that he could have charged and received 25 cents per day for each head; that the stock could be pastured ten months a year; that at the time of the trial he was pasturing some eight or nine head therein (for which he was receiving such sum), as well as some of his own horses; that if not pastured the land would produce, and there could be cut thereon, on the average about one-half tons of hay per acre; that hay was selling at $34 or $35 per ton; that for the purposes of cutting hay thereon the land would rent for about $200 per year. With respect to the interference with plaintiff's enjoyment of his dwelling, the evidence shows that the dwelling is situated about three city blocks from the pond formed above the dam; that a short distance below the dam there is emptied into the river, at a point about two and a half city blocks from plaintiff's dwelling, the sewage of the city of Dickinson; that while the greater part of the sewage of such city was treated in a septic tank, a portion thereof was raw sewage; that complaint had been made by certain residents of the city on account of the stench caused by the city sewer. The plaintiff, however, testified that the city sewer caused him no annoyance, but that the annoyance was caused by the stench from the waters above the dam. While there is evidence tending to show other sources of pollution, a majority of the members of the court are not willing to say as a matter of law that the plaintiff may not upon another trial establish that some or all of the injuries which he claims to have sustained as regards the lessened rental value of his pasture, and the interference with his dwellings, are not chargeable directly to the acts of the defendant. Hence, the judgment is reversed, and the case is remanded for a new trial.

Upon the oral argument it was suggested by defendant's counsel that he had been informed that plaintiff had died interim the taking of the appeal and the oral argument. Later defendant filed a motion to dismiss the appeal on this ground. We do not believe that under our statutes the action abated by the death of the plaintiff. Comp. Laws 1913, §§ 5446, 7408. See also § 8800, Comp. Laws 1913.

Reversed and remanded for further proceedings.

ROBINSON, Ch. J. and CHRISTIANSON and BIRDZELL, JJ., concur.

GRACE, J. (dissenting). This is an action to recover damages for the pollution of Heart river, which flows through plaintiff's land, from which until 1912 or 1913 he cut and removed ice for market, both wholesale and retail. The claims for damages are in the following amounts: $7,500 for the pollution of ice field; $3,000 for reduced value of pasture on plaintiff's farm; $2,000 for interfering with the enjoyment of his dwelling and premises, by reason of the bad odors arising from the river; $5,000 damages for preventing the sale of certain lots, and $5,000 exemplary damages.

The case was tried to the court and a jury. The jury returned a general verdict in favor of plaintiff, assessing his damages at $9,852.98. The following special questions were submitted to the jury and answered by it.

Question No. 1. Is the use of the Heart river by this defendant in the conduct of its business a reasonable use? A. No.

Question No. 2. Did the defendant company pollute the waters of the Heart river? A. Yes.

Question No. 3. If you answer question No. 2 in the affirmative, was the pollution of the waters unreasonable, considering all the circumstances? A. Yes.

Question No. 4. Is the Heart river water flowing through plaintiff's premises polluted from other sources than by the defendant company? A. Yes, natural pollution.

Question No. 5. Did any pollution put in the Heart river by the defendant company render plaintiff's land unfit for pasturage purposes? A. Yes.

Question No. 6.   What is the value per year of McDonough's untilled land for pasturage purposes?   A. $800.

Question No. 7.   What is the value per year of McDonough's untilled land for haying purposes?   A. $300.

Question No. 8.   Does a stench or foul odor come from the Heart river, on the plaintiff's premises, at times during the year?   A. Yes.

Question No. 9.   Is that stench or foul odor caused solely by matter placed in the Heart river by the defendant company?   A. Yes.

Question No. 10.   If you answer question No. 9 in the negative, are you able to determine what portion of the stench is caused by matters put into the river by the defendant company and what portion is caused by other things or from other sources of pollution, assuming that there is other pollution?   A. No answer needed.

Question No. 11.   If you answer question No. 9 in the affirmative, state whether the stench created by matters put into the stream by the defendant company has interfered with plaintiff's use of his dwelling house?   A. Yes.

Question No. 12.   If you answer question No. 11 in the affirmative state what damage in money plaintiff has suffered because of this interference with the use of his dwelling house?   A. $1,602.98.

Question No. 13.   Does the railroad dam east of McDonough's ice house contribute to the pollution of the waters running through his land, if you find there is pollution there?   A. No.

On motion of plaintiff an order for judgment was granted.   Judgment was entered upon the general verdict, for the amount above stated, together with costs for $154.70, in all, $10,007.68.   Thereafter, defendant made a motion for judgment notwithstanding the verdict, or in the alternative for a new trial.

The grounds of this motion were:

(1)  Errors in law occurring at the trial.

(2)  Insufficiency of the evidence to justify the verdict and judgment, and that the same were against law.

(3) Excessive damages appearing to have been given under the influence of passion or prejudice.

The court granted the motion and made an order, vacating the judgment.

The reasons given by the court for granting this order are:

(1) That the vital and controlling issues in the case were litigated in a prior action and are res adjudicata.

(2) Insufficiency of evidence to justify the verdict returned by the jury, or the judgment entered thereon.

Judgment was entered upon this order, vacating the judgment, dismissing the action on the merits, and awarding defendant costs in the sum of $534.65.

From the judgment thus entered, plaintiff appeals. Errors assigned are based on the claim that the court erred in granting the above motion and making the above order, and that it is in error in the reasons given for its holding.

The principal questions on this appeal are:

(a) Were the issues herein litigated in the prior action, so that they are now res adjudicata?

(b) Is the evidence insufficient to sustain the verdict?

Any other matter which need be discussed may be analyzed in connection with these dominant questions. A short statement of the material facts will aid in more clearly understanding the issues.

The plaintiff is the owner of the Northeast quarter of section 10, township 139, range 96. He has lived on this land since 1881. It adjoins the city of Dickinson on the south. Twenty-eight acres of it are within, and one hundred thirty-two acres of it are without, the townsite. Part of it was used for the pasturage of stock, and forty acres were tilled.

The Heart river enters plaintiff's land toward the southwest corner and flows entirely through it, in a northeasterly direction. Across the river, a few feet east of plaintiff's east line, the Northern Pacific Railway Company, in about 1908, constructed a cement dam. Plaintiff knew of and consented to the construction of this dam, and received a consideration from the railway company for the privilege of permitting them to construct it.

In 1910, the defendant erected a large mill near this river, and about a half mile West of plaintiff's west line. The mill is one operated night and day. About thirty-five men are required to operate it during each twenty-four hours. The men are divided into different shifts, so that all the men work part of each twenty-four hours.

In or about defendant's property, there are several toilets, or out-

houses, for use by the men or help employed in or about the mill. These empty into a septic tank, which empties into a gravel bed, and then through a bed of cinders, then a certain pipe into this river.

From plaintiff's land the mill is up stream. Plaintiff's dwelling house is about 900 feet from the river. The river is ordinarily fed by springs. The South Heart river and Bull creek, both of which empty into it, are also fed by springs.

First in order will be the consideration of the plea and issue of res adjudicata. We have no hesitancy in saying, that there is not the least merit to this claim. It requires no extended introspection of the former litigation to determine that the subject-matter and facts there and here are entirely dissimilar. If this be true, the fact that the former action was between the same parties as this is immaterial.

A concise review of the former case is necessary to lead to a clear understanding of the dissimilarity of the subject-matter and facts of the two actions. The former action, which was appealed to this court, is reported in 38 N. D. 465, 165 N. W. 504. That was an action, commenced on June 5, 1914, for an injunction to enjoin defendant from a further pollution of the Heart river, and for damages in the sum of $40,600. These damages clearly were claimed for injuries received prior to the time of the commencement of that action.

Paragraph 9 of the complaint there reads thus: "That, by reason of the foregoing, and by reason of defendant's said wilful and negligent acts, in constructing and maintaining said sewer system, and in polluting the waters of said Heart river, plaintiff has been, and is, damaged in the sum of $35,000."

Other elements of damage were there pleaded, and the manner and form of pleading them clearly shows that they were such damages as were claimed to have occurred from prior injuries, the nature of which is set forth in the complaint, and which continued down to the time of the bringing of that action. The prayer of that complaint was as follows:

"Wherefore plaintiff prays judgment against defendant (1) For the sum of $35,000; (2) for the further sum of $5,600, for damages to the pasture; (3) that defendant be forever restrained from polluting the waters of the Heart river, by depositing human excreta, or mill refuse therein, or in any other manner; (4) for the costs and disburse-

ments of this action; and (5) for such other and further relief as plaintiff shall show himself entitled to."

On November 27, 1914, and the day following, that case was tried to the court without a jury.

Evidence was introduced by the defendant, to the effect that it was then constructing, at the mill, a septic tank. That the latest and most approved scientific apparatus and appliances for purification were utilized in such construction; that the same would completely deodorize and destroy all bacteria and germs; that a large force of men were then at work on such construction; and that the tank would be fully completed and in use within ten days or two weeks from the time of the trial.

The findings of the trial court in that case, of date of August 31, 1915, contain the following: That "defendant installed a septic tank at his said mill and elevator; that since that time it has not discharged and is not now discharging into the Heart river, any sewage from its said mill or elevator, and by reason of said instalment of said septic tank, by said defendant, it has ceased to discharge into the Heart river any sewage matter, such as it was discharging thereinto at and prior to the time of the commencement of said suit."

This finding, of course, relates to the condition that was supposed to exist at the time of the completion of the septic tank. Principally on the strength of this showing, the trial court denied plaintiff any injunctive relief and awarded him nominal damages, in the sum of $100, for injuries alleged to have been sustained by him at the time of the commencement of that action. An appeal from that judgment was taken to this court and the judgment affirmed.

The character of the pollution of this stream by defendant, prior to the time of the commencement of the former action, is shown by the evidence in that case.

Robert S. Davidson, who had been the manager of the Russell-Miller Milling Company for five years, or ever since the Russell-Miller Milling Company at Dickinson had been in operation, at the former trial, in substance, testified, that, in that mill there are closets, or privies, for the use of the employees, which closets discharged into the sewer, which discharged into the river; that there were between twenty-five and thirty men employed in the mill, and had been for the last five

years, sometimes more and sometimes less; that one of the closets had been in constant use; that the mill, as a rule, runs night and day, the year round; that there has been practically no shutdown since it started; that the excretions of these men have been deposited in the Heart river, through the closet, at all times since the mill has been oprating.

By another witness it was shown that the fact that this excreta was being so directly discharged into the river was a matter of public notoriety for three or four years preceding the trial; that the public in Dickinson and elsewhere, upon learning this fact, refused longer to buy the ice; that none of the customers wanted it.

Other evidence shows that, after the mill began to operate, the bottom of the ice on plaintiff's ice field was covered by black particles, and it became unmarketable, and thereby his ice business became destroyed.

Plaintiff testified that in former years there were fish in the river. Since the erection of the mill he has seen dead ones. He had not noticed any live fish the last three winters.

In that case Professors Snyder and Hulburt, chemists and bacteriologists, gave testimony to the effect that samples of water taken from the Heart river, some distance above the mill, and in the river in the vicinity of plaintiff's ice house, each contained about the same amount of colon bacilli. They testified, also, that the ice taken from the river in the vicinity of plaintiff's ice house, when tested, showed no colon bacilli, and explained this upon the theory that, during the crystallization of the ice, the colon bacilli is eliminated, by being pushed outward, so that it is not retained in the ice, and that the same, for all practical purposes, was pure.

There was some testimony by other witnesses in that case as to the offensive odors existing in and emanating from the river, between the mill and the railroad dam. In the present case, there was a great deal of testimony showing the polluted condition of the river between the mill and the railroad dam. It was of a much more positive character than testimony in that regard in the former case. It shows that the septic tank, at one time, was working improperly; that there is an unbearable stench from the discharge of the pipe leading from the septic tank; that particles of human excreta float on the river; that tissue paper is found in large quantities thereabouts, and that the bottom of

the river, instead of being as formerly, covered with gravel, is now, since the erection of the mill, between the mill and the railroad dam, covered with a malodorous muck, ranging from $4\frac{1}{2}$ to 7 feet in depth.

Plaintiff introduced many samples of water, some taken above the mill, showing the uncontaminated condition there, and some taken between the mill and the railroad dam, showing the polluted, contaminated, and putrid condition of the water in the river.

Testimony here further shows, that the stock will not drink the water. There is abundance of testimony on the part of plaintiff to show the polluted condition of the river between the mill and the railroad dam to such an extent as to cause it to become of practically no value to the plaintiff, for the purposes for which the evidence shows he had always used it.

His testimony further shows that ice was taken from the ice field between the mill and the railroad dam for two years after the latter was constructed, and that the same was just as pure as it had been in prior years, but that immediately upon the construction of the mill, the water became polluted. The experts, Snyder and Hulburt, who testified for defendant in the former case, also testified in this case, and generally in support of defendant's theory.

We cannot take further time nor space to refer to the evidence in the former, nor in this, case. Sufficient has been said to direct the attention to the important evidence in either case. The trial court in the former action presumably did not grant injunctive relief, upon the theory that the construction of the septic tank would result in an abatement of the nuisance. It is fair to assume that but for the showing made by defendant in that regard, the injunction would have been granted, restraining the continuance of the nuisance then clearly shown to have existed.

The defendant claimed, in effect, in regard to the septic tank, that it did not construct it because of necessity, but, as a matter of sentiment. We think, however, the energy displayed by defendant, before the hearing of the injunction, in proceeding to construct the septic tank, and the full showing at that trial, as to what it was doing in that regard, had the effect to prevent the issuing of an injunction, on the theory above stated.

Now it is clear that, if the defendant, by the installation of the

septic tank, had wholly abated the nuisance, the pollution of the river in that locality would have practically ceased, and further injuries to plaintiff's property would not have occurred. But it is absolutely clear, from the evidence, on behalf of plaintiff in this action, that the installation of the septic tank did not abate the nuisance; and that it has ever since then continued; that since the installation of the septic tank there has been practically no diminution of the pollution.

This being true, a new cause of action for damages arose in plaintiff's favor, for the continuation of the nuisance, from the time of the commencement of the former action where was shown the installation of the septic tank, and resulting in the judgment above mentioned.

This cause of action relates to a new subject-matter, to-wit: the continuation of a nuisance after it was claimed, by the plaintiff, to have been abated.

While the subject-matter and facts proved in this case at first may appear, from a superficial examination, to be similar to the subject-matter and facts proved in the former case, they appearing to be facts of somewhat similar nature, they are not the same, but wholly different, for they do not, in fact, relate to the same subject-matter, but, to a new and different one, just as distinct in character as any two actions of admittedly distinct subject-matter.

"Where the nuisance is of a continuing nature, each continuance gives rise to a new cause of action and successive actions may be maintained for the damages accruing from time to time." 29 Cyc. 1255. See also there, note 23, citing cases from many states, supporting this principle, among which are cases from Illinois, Indiana, Massachusetts, New York, Ohio, Pennsylvania, and other states. Under this note is also cited the decision of the Supreme Court of the United States, in the case of Baltimore & P. R. Co. v. Fifth Baptist Church, 137 U. S. 568, 34 L. ed. 784, 11 Sup. Ct. Rep. 185.

We have no hesitancy in stating, that the plea of res adjudicata is here unavailing, and is without any merit whatever.

20 R. C. L. p. 401, § 22, in an analysis of a nuisance of the character we are considering, states the matter as follows: "A nuisance of very common occurrence may be produced by the obstruction of or interference with water rights such, for example, as an unreasonable diversion of waters, or their pollution by débris from mines and factories, or the

filth that flows and seeps from drains and sewers. The rule of law is uniform and undoubted that every riparian owner is entitled, as an incident to his land, to the natural flow of the water of a stream running through it, undiminished in quantity and unimpaired in quality, subject to the reasonable use of the water by those similarly entitled, for the ordinary purposes of life; and any sensible or essential interference therewith, if wrongful, whether attended with actual damage or not, is actionable."

For cases sustaining the principle enunciated in the above section of R. C. L., see note, 19, citing a large number of them, among which, is that of Bowman v. Humphrey, 132 Iowa, 234, 6 L.R.A.(N.S.) 1111, 109 N. W. 714, 11 Ann. Cas. 131. In that case the supreme court of Iowa, speaking through Weaver, J., said: "Nuisance is a condition, and not an act or failure to act on part of the person responsible for the condition. If the wrongful condition exists, and the person charged therewith is responsible for its existence, he is liable for the resulting damages to others, though he may have used the highest possible degree of care to prevent or minimize the deleterious effects. Nor it is any answer to say that a creamery, or tannery, or industrial plant of any kind, is a perfectly legitimate enterprise, or one of great and general convenience and benefit; for, if it be of such a nature, or be so conducted, that it substantially pollutes or destroys the usefulness and value of the water to the proprietors of the lower lands, it is a nuisance for which action will lie, *though the utmost care has been taken to avoid all just cause of complaint.*"

Citing in support, Sutherland, Damages, 4th ed. § 1035; Pach v. Geoffroy, 67 Hun, 401, 22 N. Y. Supp. 275; Aldrich v. Howard, 8 R. I. 246; Pennoyer v. Allen, 56 Wis. 502, 43 Am. Rep. 728, 14 N. W. 609; Laflin & R. Powder Co. v. Tearney, 131 Ill. 322, 7 L.R.A. 262, 19 Am. St. Rep. 34, 23 N. E. 389; Ducktown Sulphur Copper & Iron Co. v. Barnes, — Tenn. —, 60 S. W. 593; Bohan v. Port Jervis Gaslight Co. 122 N. Y. 18, 9 L.R.A. 711, 25 N. E. 246; Dygert v. Schenck, 23 Wend. 446, 35 Am. Dec. 575; Jutte v. Hughes, 67 N. Y. 267; Hauck v. Tidewater Pipe Line Co. 153 Pa. 366, 20 L.R.A. 642, 34 Am. St. Rep. 710, 26 Atl. 644; Susquehanna Fertilizer Co. v. Malone, 73 Md. 268, 9 L.R.A. 737, 25 Am. St. Rep. 595, 20 Atl. 900; Stokes v. Pennsylvania R. Co. 214 Pa. 415, 63 Atl. 1028. See also case of

Ingmundson v. Midland Continental R. Co. 42 N. D. 455, 6 A.L.R. 714, 173 N. W. 752.

Other cases directly in point are MacNamara v. Taft, 196 Mass. 597, 13 L.R.A.(N.S.) 1044, 83 N. E. 310; Middlestadt v. Waupaca Starch & Potato Co. 93 Wis. 1, 66 N. W. 714; People ex rel. Goff v. Kirk, 65 Misc. 657, 122 N. Y. Supp. 604; Bradley v. Warner, 21 R. I. 36, 41 Atl. 564.

Joyce, in his work on Nuisances, § 266, states the rule thus:

"As a general rule every riparian proprietor is entitled to have the natural water of the stream transmitted to him, without sensible alteration in its character or quality and any invasion of this right, causing actual damage or which is calculated to found a claim which may ripen into an adverse right, entitles the injured party to the court's intervention. So, every proprietor of the soil through which a stream passes, has a right to have it run in its natural current, without diminution or obstruction. . . . It is the right of every owner of land over which a stream of water flows, to have it flow in its natural state and with its quality unaffected. The right to a stream of water is as sacred as a right to the soil over which it flows. It is a part of the freehold, of which the owner cannot be disseized except by due process of law, and the pollution of a stream constitutes the taking of property, which may not be done without compensation." Citing, Kewanee v. Otley, 204 Ill. 417, 68 N. E. 388.

"So it has been declared in an Iowa case that the lower owner of land upon a stream has the right to have the water which flows from the land of an upper owner in as pure and wholesome condition as a reasonable and proper use of the stream by the upper owner will permit. What is a reasonable use must be determined from the circumstances of the case." See, Ferguson v. Firmenich Mfg. Co. 77 Iowa, 576, 14 Am. St. Rep. 319, 42 N. W. 448.

The author, then, in § 267, proceeds to discuss what is a reasonable use and arrives at the conclusion, which is the general rule, that: "Whether the use of a stream by one riparian proprietor is reasonable or not, in view of the rights of other proprietors, depends largely upon the circumstances of each case, and it is essentially a question of fact." Citing, Platt Bros. & Co. v. Waterbury, 72 Conn. 531, 48 L.R.A. 691, 77 Am. St. Rep. 335, 45 Atl. 154.

There is no doubt of the correctness of this principle. It must follow, therefore, that the question of reasonable use in this case was one of fact, exclusively for the jury. It has decided, in answer to a special question submitted to it, that the use of the Heart river, by the defendant, in the conduct of his business, is not a reasonable one. See, question 1 and answer, supra. Other special questions and answers show, that the defendant polluted the waters of the Heart river, and that such pollution was unreasonable. See, special questions and answers, supra.

There are no inconsistencies between the answers to the special questions and the general verdict. The principal error remaining to be examined, relates to the error of the trial court in holding that the verdict was not sustained by the evidence. This needs no extended discussion. The trial court's order granting the judgment notwithstanding the verdict, on that ground, is so clearly erroneous that a lengthy discussion of it would be a waste of time and energy. The most casual examination of the evidence will readily disclose that the verdict is sustained by substantial evidence. That is all that is required.

The evidence adduced by plaintiff is direct and certain, in kind and quality, with reference to the pollution of the river, in the time and manner shown by such evidence. It was convincing, as shown by the return of the general verdict in plaintiff's favor, and the favorable answer given in his favor, by answers to the special questions.

It is true defendant placed experts on the stand, who gave testimony, which, to some extent, is contradictory of plaintiff's evidence of the pollution; but that, as all of the evidence, is for the jury. An examination of the evidence will show that the plaintiff's injury is neither fanciful nor imaginative, but substantial, tangible, and material. There is no other conclusion that reasonably could be reached, other than that the verdict is abundantly sustained by substantial evidence.

Some evidence was introduced by defendant, by which it endeavored to show that there were other sources of pollution than that claimed by plaintiff. The answer to special question No. 8 finds that a stench or foul odor does come from the Heart river, on plaintiff's premises, at times during the year; and the answer to special question No. 9 finds that such stench or foul odor is caused solely by matter placed in the Heart river by defendant company.

The only pollution, other than that by defendant, which the jury

found, was *natural pollution* of the river, while flowing through plaintiff's premises. That, as we understand, would be such pollution as would occur by reason of natural, as contradistinguished from artificial, causes. It would be such as would be caused by erosion, etc. It would occur without acts of persons contributing thereto; while, on the other hand, artificial pollution would be that which is caused by the act of some person, or agency, which contributes in some way to the creating or originating of a nuisance, which is shown, in some manner, to have become connected with the water of the river, to such an extent as to pollute it.

The jury have, in effect, found, that there was no pollution of the river on plaintiff's premises, by artificial means, other than that by defendant, for it found there were no other sources of pollution nor other pollution, except by the defendant, other than natural pollution. There was some evidence in regard to the conditions in South Dickinson, showing there were a large number of families living there, and that, in connection with their premises, there were privies, some piles of manure and rubbish, etc., which defendant endeavored to show were sources of pollution.

There is no evidence to show that any of such matter reached the river. There is evidence, showing that, for three or four years preceding the bringing of this action, there was little rainfall in the vicinity of Dickinson. The court may take judicial notice of the seasons, and of the extreme general drought in Western North Dakota, during the time mentioned. It is a matter of common knowledge. There could not be, in such circumstances, much, if any, surface drainage; neither could there well be underground drainage or seepage.

The jury must have taken all these matters into consideration and it decided the only pollution of the river on plaintiff's premises, aside from that by defendant, was that caused by natural pollution.

The evidence adduced by plaintiff at the trial, clearly established the continuation of the nuisance by the defendant, and the damages, and the different elements of the damage, resulting therefrom. There is no doubt of the sufficiency of substantial evidence to support the verdict.

The jury has, in the exercise of its constitutional powers, decided
47 N. D.—17.

the questions of fact involved in this case. This court has no right nor authority to invade the province of the jury. It cannot substitute its judgment for that of the jury, nor usurp its privileges and functions.

The majority opinion clearly takes away from plaintiff the advantages he gained by the verdict of the jury. It does not pass upon the insufficiency of the evidence to sustain the verdict, but deliberately substitutes its own convictions, and decisions on the questions of fact, for that of the jury; and this, upon every element of damage established by competent and substantial evidence by the plaintiff.

A more flagrant invasion of the rights and province of the jury is not found in the books. This court, under the evidence in this case, cannot say, nor could any court say, that the verdict is not sustained by substantial evidence. It should be remembered that the question is not now whether plaintiff has sustained his burden of proving his cause of action by a preponderance of the evidence, but, on the other hand, it is, whether or not there is any substantial evidence to sustain the verdict.

The majority opinion, however, seeks to strengthen the position it has assumed, by maintaining that the verdict cannot be sustained, for the reason that the plaintiff cannot claim any damages for the injury to his ice field. The language of the majority opinion in that respect, is as follows:

"We are entirely satisfied that the verdict cannot stand, and that the trial court was correct in so far as he held that the plaintiff could not recover any damages for the alleged damages occasioned by pollution of the ice field. The plaintiff testified that he had, in the course of the years, taken this ice and sold it to the people of Dickinson and vicinity; and that the ice cutting privilege, during the years in question, in this action, was worth from $1,500 to $2,000 per year. Yet, the evidence shows that, prior to the time involved in this action, the city of Dickinson enacted an ordinance prohibiting the cutting of ice on Heart river, at any point within the limits of the city of Dickinson. This ordinance was in effect before the first action was tried. See 38 N. D. 465, 165 N. W. 508. There is no contention that it has ever been repealed or altered. On the contrary, all references to it, during the course of the trial, implied that it was in full force and effect. Hence, we have the situation that the cutting of ice on plaintiff's prem-

ises was expressly forbidden by the laws of the municipality, within which they were situated. Manifestly, he could sustain no damage by reason of that other act, which might prevent him from, or make it unprofitable for him to attempt to violate the law."

The ordinance to which reference is made is one, which made the cutting of ice in plaintiff's ice field, on the Heart river, and the selling of it, at Dickinson, and vicinity, a public nuisance, in that those acts were dangerous to the public health. It passed the ordinance on the theory that the cutting and selling of the ice was a public nuisance.

In the trial of the former case, the ordinance was introduced in evidence, in support of plaintiff's case, over the objection of defendant. The following testimony was given in the former case:

"Q. Prior to the location of the mill there, did you operate any business in connection with this stream, the Heart river, that flows through your land?

"A. Yes, sir.

"Q. What business was that?

"A. The ice business.

"Q. For about how many years did you maintain that?

"A. Since '83.

"Q. When was the last year you cut ice upon your land there?

"A. Last winter, started to cut ice.

"Q. Were you ever stopped from cutting ice upon this land?

"A. Yes, sir.

"Q. By whom?

"Counsel for defendant: I object to that, unless it appears it was by the defendant in this action, on the ground that, were he forbidden to cut ice by nobody else than the defendant, it would not be binding upon the defendant.

"Q. You may answer.

"A. Why, I was stopped from cutting by the board of health, one of the board, I asked if I had the right to cut for cold storage. No, he said, 'It might possibly be used for drinking purposes.' Advised me to cut somewhere else.

"Counsel for defendant: I move to strike the answer as not being the best evidence, the same not being in writing, as being the act of a

so-called board or official authority, which, in order to have effect, must be in writing and which would not, in any event, be bending upon the defendant in this action, and as sharing, in any respect, its rights, duties, or obligations.

"The witness: And further there is written notice in the Dickinson Press, which forbids the ice cutting below the dam.

"Mr. Heffron (plaintiff's attorney): We now offer in evidence, Exhibit B, the same purporting to be a true and correct copy of the ordinance of the city of Dickinson, which has been duly passed, as appears from the appendant dates, at the bottom thereof, and which ordinance is now in full force and effect.

"Counsel for defendant: We have no objection to the foundation laid, showing the passage, approval, and publication of the ordinance, but defendant objects to the same, on the ground that it is not competent proof of any fact, or facts, which would bind the defendant in any matter at issue in this lawsuit; that it is irrelevant and immaterial, and that the rights of the parties to this action cannot be, in any wise, affected, either the right of the plaintiff, as set out in his complaint, or otherwise, by the passage of this ordinance, and that the same is in no wise binding upon and determinative of any of the rights of the defense in this action."

It will thus be seen, that the position of the defendant in the former trial, as to the relevancy of the ordinance, is entirely contrary to that of the majority opinion in this case. We think defendant's position there, in the manner stated in its objection, is correct, for the reason that, if it be conceded the city had the right and authority to restrain the commission of the public nuisance, to-wit, the cutting and sale of the ice, that could not prevent plaintiff from recovering damages for any special injury suffered by him, on account of the pollution of the stream, resulting in the pollution of his ice field, and thereby damages to his property.

We have conclusively above shown that the pollution of the stream by defendant was a nuisance. On this point there can be no dispute. The pollution of the stream was the cause of the pollution of plaintiff's ice field. The pollution of the stream and of the ice field caused the city of Dickinson to pass an ordinance prohibiting the cutting and sale of ice from this ice field. Plaintiff was the owner of the ice field,

and, as such, had a right to cut and sell the ice, except for the ordinance prohibiting him from doing so, enacted because of the existence of the nuisance, but not until after the pollution of the stream and ice field by the defendant.

If it be conceded that the city had authority to enact the ordinance, it could not thereby take away plaintiff's property right to recover damages for special injury suffered by him. This rule is so well settled that it scarcely needs to be mentioned. This principle was enunciated in an early case which came before the Supreme Court of the United States, entitled Georgetown v. Alexandria Canal Co. 12 Pet. 91, 9 L. ed. 1012, there, the court, in its opinion, stated: "A public nuisance being the subject of criminal jurisdiction, the ordinary and regular proceeding at law is by indictment or information, by which the nuisance may be abated; and the person who caused it may be punished. If any particular individual shall have sustained special damage from the erection of it, he may maintain a private action for such special damage; because, to that extent, he has suffered beyond his portion of injury, in common with the community at large."

See, also, Muir v. Louisville & N. R. Co. (D. C.) 247 Fed. 888–897; Angle v. Chicago, St. P. M. & O. R. Co. 151 U. S. 1–19, 38 L. ed. 55–64, 14 Sup. Ct. Rep. 240. In the latter case, in the syllabus, the court states this principle: "A right of action to recover damages for an injury is property, and the legislature has no power to destroy such property."

Both of these cases were cited with approval in the case of McGregor v. Great Northern R. Co. 42 N. D. 269, 4 A.L.R. 1635, 172 N. W. 845, the opinion there being by Mr. Justice Birdzell, and concurred in by Justices Christianson and Robinson. The power of a city council to pass ordinances is legislative in character.

"Because the nuisance affects a great number of persons in the same way, it cannot conclusively be said that it is a public nuisance and nothing more. The fact that a nuisance is public does not deprive the individual of his action in cases where, as to him, it is private and obstructs the free use and enjoyment of his private property." Joyce, Nuisances, § 424; Fisher v. Zumwalt, 128 Cal. 493–496, 61 Pac. 82; Harniss v. Bulpitt (1905) 1 Cal. App. 140, 81 Pac. 1022; Wylie v. Elwood, 134 Ill. 281–287, 9 L.R.A. 726, 23 Am. St. Rep. 673, 25 N.

E. 570; Scheurich v. Southwest Missouri Light Co. 109 Mo. App. 406–420, 84 S. W. 1003; Wilcox v. Henry, 35 Wash. 591, 77 Pac. 1055.

"The doctrine now is that a nuisance may be at the same time both public and private. An individual, who receives actual damage from a nuisance, may maintain a private action for his own injury, although there may be others in the same situation." Joyce, Nuisances, § 424.

"It is a general rule that the person who erects, constructs, or creates a nuisance is liable for the injury thereby occasioned, in such civil or criminal action, suit or proceeding, as the nature of the nuisance and the surrounding attendant circumstances warrant." Joyce, Nuisances, § 447. See authorities cited in note 144.

"A private corporation may be held liable in a civil action for creating and maintaining a nuisance." Joyce, § 450. Cases cited in note 159.

The majority opinion is not based upon the points or assignments of error presented upon this appeal. The questions presented here are only those above stated, to-wit, that this action is not res adjudicata, and that there is sufficient evidence to sustain the verdict; that these vital, and, in fact, only, points in this case, are ignored by the majority opinion is manifest.

The majority opinion quotes considerable testimony to show that other sources of pollution contributed to plaintiff's injury, but that, as well as all of the evidence, was for the jury. It decided specifically that there were no other sources of pollution, other than natural, and there is substantial evidence to sustain its verdict in that regard.

We can find no reason in the record why the judgment appealed from should not be reversed and the case remanded, with instructions to the trial court to reinstate the judgment in favor of plaintiff. Neither does the majority opinion point out any reason why this should not be done. There is no legal reason given why a new trial should be granted. There is no legal reason shown why plaintiff should not recover the damages to his ice field. He sustained the burden of proof upon every element of his cause of action, including damages to his ice field; in regard to the damages to the ice field, the trial court gave the following instruction:

"Plaintiff claims to recover by reason of an alleged injury to, and

interference with, the privilege of cutting and harvesting ice on the stream in question. I charge you, gentlemen of the jury, before you can find for the plaintiff on that account, you must find, and plaintiff must establish, by a preponderance of the evidence, that such use of the stream for such purpose, by the plaintiff, was a reasonable use, under all the facts and circumstances as shown, that is, taking into consideration, as I have stated to you, the condition and situation of the stream, the normal condition of the country through which the stream flows, the proximity of any towns or cities, or any manufacturing establishments—taking all of these facts and circumstances into consideration, was or was not the use of this stream for ice cutting purposes a reasonable use, as those facts and circumstances are disclosed by the evidence in this particular case. And unless it is so established to have been such a reasonable use, then and in that event, plaintiff is not entitled to a verdict at your hands, on account of any injuries suffered by him, by reason of such interference or injury to such ice business. Likewise, with reference to this matter of pasturage: I further charge you, that if you find for plaintiff and return a verdict for him on account of such injury to such ice business, the measure of damages is the value of his right to harvest ice upon the premises at the proper times and seasons, and the loss of profits, which would have flowed directly to him by reason of his so doing, had he been able so to do."

Plaintiff conclusively proved the value of the privilege of cutting ice during the years 1914 to 1918, both inclusive. His evidence in this regard is undisputed. When the trial court gave the above instruction, it must have been impressed with the fact that plaintiff had offered substantial evidence, with reference to the damage resulting from the loss of the privilege of cutting ice, etc., which evidence it felt it to be his duty, as an impartial court, to submit to the jury; otherwise, it would have refrained from giving the above instruction.

The verdict recovered by plaintiff was not excessive. Neither is there anything to indicate or show, nor did the trial court hold, that the judgment was rendered under the influence of passion and prejudice.

Through a course of tedious litigation, extending over a term of several years, the plaintiff has sought to protect his rights in his property, and at the hands of a jury of his fellow peers, in a county far removed from the place of his residence, he was awarded justice and compensa-

tion for the injuries to his property and for the unlawful invasion of the right of use and enjoyment thereof. The verdict of the jury in his favor should remain inviolate.

The error of the trial court, in setting aside plaintiff's judgment and awarding defendant judgment of dismissal, should not be dealt with, in language that is harsh, for it is clear, that it was impressed by defendant's claim to the effect, that the subject-matter of this action is res adjudicata, but this court has no such impression. It knows that this cause of action is not res adjudicata.

From what has been above stated, it would seem to us that the decision of the majority is an arbitrary one, which finds no support in the law applicable to this case, nor in the facts, as disclosed by the evidence and found by the jury.

Justice requires that the judgment appealed from should be reversed and the case remanded, with instructions to the trial court to reinstate plaintiff's judgment. Nothing less will be either law or justice.

BRONSON, J., concurs.

On Petition for Rehearing, Filed March 26, 1921.

PER CURIAM: Plaintiff has petitioned for a rehearing. The principal complaint of the former opinion is with respect to our holding that upon the evidence in this case the plaintiff is not entitled to recover damages for the alleged pollution of his ice field. In this connection it is pointed out that the ordinance prohibiting the plaintiff from cutting ice was not pleaded, and hence it is asserted that it was not available as a defense. It is true the defendant did not plead the ordinance; but it did plead the adjudication in the former action as a defense and it offered the record in that action in evidence, and asked the trial court to take judicial notice of the decision of this court in that case. As pointed out in the former opinion in this case, at the time of the trial of the former action the *plaintiff* offered the ordinance in evidence. No question was raised as to its validity or effectiveness. On the contrary the position of the plaintiff was that the ordinance had been enacted because of the actions of the defendant, and that since it was adopted, plaintiff had been precluded absolutely from cutting ice.

In our former opinion in this case we quoted at length from the decision rendered on the former appeal. In the portion quoted, the provisions of the ordinance as well as the circumstances incident to its passage were discussed, and the conclusion reached that the enactment of the ordinance was not evidence of the alleged wrongful acts of the defendant; that since the enactment of the ordinance the plaintiff had been precluded from cutting ice, and hence no damages could have been sustained by reason of the loss of the ice cutting privilege subsequent to the time the ordinance became effective. Manifestly, the pleas of the former adjudication, and the offer of the record in that case inclusive of the decision of this court in evidence upon the trial of this action, made the ordinance as set out in the decision, part of the proof in this case.

It is suggested in the petition for rehearing that the ordinance may have been repealed, or that it may be invalid. On the record before us, we would not be justified in assuming any such condition. The presumption is the ordinance remains in force. Comp. Laws 1913, § 7936, subd. 32. On the trial of the first action plaintiff invoked the ordinance as a valid measure. Its validity has never been questioned by anyone. Certainly invalidity should not be assumed, and it is quite doubtful if plaintiff could be heard to question its validity at this time. See 10 R. C. L. p. 836, § 140; 1 Van Fleet, Former Adjudications, pp. 500, et seq. See also Missouri v. Chicago; B. & Q. R. Co. 241 U. S. 533, 543, 60 L. ed. 1148, 1156, 36 Sup. Ct. Rep. 715.

We see no reason for qualifying or changing our former decision in this case. The conclusions announced therein will stand, that the evidence adduced upon the trial of this action did not warrant the award of any damages to the plaintiff for the alleged loss of profits for the pollution of the ice field; but that as to the other two elements of damages (while the evidence is far from satisfactory), a majority of the court do not feel justified in saying, as a matter of law, that there is no cause of action.

Rehearing denied.

ROBINSON, Ch. J., and CHRISTIANSON and BIRDZELL, JJ., concur.